NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

MIDWESTERN MANUFACTURING COMPANY, Inc., Midwestern Engine and Equipment Company, Inc., and Midwestern Pipeline Products Company, Respondents.

No. 9405.

United States Court of Appeals Tenth Circuit.

Jan. 15, 1968.

Robert Hillman, Washington, D. C. (Arnold Ordman, Dominick L. Manoli, Marcel Mallet-Prevost, Washington, D. C., with him on brief), for petitioner.

William K. Powers, Tulsa, Okl. (Frank E. Turner, Tulsa, Okl., with him on brief), for respondents.

Before MURRAH, Chief Judge, PICKETT, Circuit Judge, and DELEHANT*, District Judge.

MURRAH, Chief Judge.

This matter arises from unfair labor practices complaints consolidated for hearing after the Union[1] lost a 9(c) representation election. In essence the several complaints charged that the employer sought to undermine the Union organization by coercing and otherwise interfering with its employees' free choice in violation of 8(a) (1) of the Act, 29 U.S.C. § 151 et seq.; that in spite of this unlawful activity the Union succeeded in acquiring authorization cards from a majority of the employees in two of the employer's companies; that thereafter the employer unlawfully refused to bargain with the Union in violation of 8(a) (5);[2] and that it continuously sought to destroy and did destroy the Union's majority, also in violation of 8 (a) (1). The Union thus sought to have the election set aside and the employer ordered to bargain with it as the majority representative of the employees in two of the employer's companies.

The trial examiner found that the Regional Director had properly decided that the three companies involved, i. e. Midwestern Manufacturing Company, Inc., Midwestern Engine and Equipment Company, Inc., and Midwestern Pipeline Products Company, constituted a single employer with two appropriate bargaining units;[3] that the production and maintenance employees of Manufacturing comprised Unit A and the production and maintenance employees of Engine's Oklahoma City and Tulsa plants and Pipeline's plant comprised Unit B. The examiner further found that the employer had violated 8(a) (1) in both Units by unlawfully interrogating, threatening and promising benefits to its employees thus frustrating their rights to engage in union activity, assist the Union and select it as their bargaining representative. He also significantly found that the Union had not acquired

---

* Senior District Judge for the Eighth Circuit sitting by designation.

1. International Union of Operating Engineers, AFL–CIO.

2. Other violations were charged in the complaints but have no bearing here.

3. No one objects to the appropriateness of the designated bargaining units.

its alleged majority of the employees in Unit B when it demanded recognition and bargaining, hence there could be no unlawful refusal to bargain by the employer in violation of 8(a) (5). He did think, however, that the unlawful 8(a) (1) conduct of Engine and Pipeline interfered with a free and untrammeled choice of their employees in the Unit B election and recommended that the Unit B election be set aside and another conducted upon request by the Union made within thirty days following Engine and Pipeline's compliance with the remedy for the 8(a) (1) violations.

No exceptions or cross-exceptions to the examiner's findings were filed by the employer in either Unit, and on review the Board adopted the findings insofar as they related to the 8(a) (1) violations committed in both Units. The Board, however, modified the examiner's findings and conclusions regarding the 8(a) (5) allegations as to Engine and Pipeline to hold that the Union did have a majority status when it made its bargaining demand. It concluded that in view of the 8(a) (1) violations, Engine and Pipeline did not premise their refusal to bargain on good faith, but rather on a desire to gain time to destroy the Union's majority, and that, therefore, the employer in Unit B had violated 8(a) (5). The Board thus rejected the examiner's recommendation for a new election and ordered Engine and Pipeline to bargain with the Union. It seeks enforcement of that order here.

 Manufacturing is involved in this action only insofar as the trial examiner found that it violated 8(a) (1). The employer seeks here to have all of the decreed 8(a) (1) violations in both Units set aside for lack of substantial evidence to support them. Since, however, admittedly no exceptions whatsoever were filed to the examiner's find-

ings, we will not consider such objections lodged for the first time with us. See N. L. R. B. v. International Union of Operating Engineers, Local 66, 1 Cir., 357 F.2d 841, and cases cited; Marshall Field & Co. v. Board, 318 U.S. 253, 63 S.Ct. 585, 87 L.Ed. 744. This means, of course, that the Board's order in that respect will be enforced as to Manufacturing, Engine and Pipeline.

This leaves for consideration only the 8(a) (5) violations, i. e. refusal to bargain. The Board's order rests squarely upon its finding that the Union at the time of its bargaining demand had a card majority. It seems to be conceded that if it did not, the employer was never under a duty to bargain, hence a bargaining order would not be a proper remedy.[4] Our primary question then is whether the Union had authorization cards for a majority of the production and maintenance employees of Engine and Pipeline, i. e. Unit B, at the time it made its bargaining demand. Resolution of this question turns on the validity of one authorization card which we do not think is supported by the record.

The background facts and critical dates are helpful only to an understanding of the complex surroundings in which this issue is cast. All three companies originally involved are jointly and solely owned by Armon H. Bost, Tulsa, Oklahoma, President and operator of each. Each company maintains its principal office at substantially the same site in Tulsa, and Engine has a branch plant and office in Oklahoma City. About the middle of August, 1964, the Union began its organizational activity at Engine's Tulsa plant, and on August 17 delivered a letter to Bost stating that it held authorization cards from a majority of Engine's production and maintenance employees; that it was amenable to a card check by an independent third

---

4. General Counsel concedes in his brief that a bargaining order is entered "only when the Union secured majority support, lost it as a result of the employer's unfair labor practices and the election, if any, is set aside." He also apparently recognizes that this is precisely the basis for the decisions in Bernel Foam Prods. Co., 146 NLRB 1277 and J. C. Penney Co. v. NLRB, Aug. 29, 1967, 10 Cir., 384 F.2d 479, cited and relied upon by the Board.

party and that it requested recognition and a meeting to negotiate in behalf of the employees. On the same date Bost received a letter from the International Brotherhood of Boilermakers stating that it represented a majority of the production and maintenance employees of Manufacturing, requesting recognition and negotiations and offering to submit to a card check. Both the Union and the Boilermakers were immediately informed by Bost's attorney that neither Engine nor Manufacturing was in a position to dispute the authorization cards, but that each wished "to determine and ascertain for ourself that such persons have currently in effect either an authorization for such representation or membership in your Union." He further stated to each that since another union had requested rights of representation for a companion company operated at the same location and through the same management, it was necessary that the National Labor Relations Board conduct an election to certify the proper union and also determine the appropriate unit for collective bargaining purposes. The attorney then stated he would be available the following week to meet and discuss the situation.

The Union thereupon filed a petition for certification as bargaining representative for employees at Engine's Tulsa plant and attached its signed authorization cards. Boilermakers then filed a petition for certification as bargaining representative for the employees of Manufacturing. The Union thereafter filed an amended petition to include within the unit it sought to represent the employees at Engine's Oklahoma City plant and also the employees of Manufacturing. It attached three additional cards for Engine's Tulsa employees and signed cards for Manufacturing's employees. A hearing was held on the petitions on September 11, at which time the Union produced a signed card of an employee of Pipeline in connection with a showing of interest in representing the employees at that company. On the same date by letter to Bost it renewed its demand for recognition as representative of the employees at Engine's Oklahoma City and Tulsa plants and Manufacturing's plant. Again there was an offer to submit to a card check.

On October 6 the Regional Director issued his decision designating the appropriate units and directed an election. Both the Union and Boilermakers were to appear on Manufacturing's Unit A ballot, and only the Union was to appear on Engine and Pipeline's Unit B ballot. The parties all agreed to an election on October 16 and notices and other data were properly distributed and posted by Bost.

On October 10 the Union again wrote to Bost demanding recognition as the representative of Engine and Pipeline's employees. Bost's attorney refused this demand stating that "since an election had been scheduled for October 16, 1964, and provisions had been made by the Board for holding of the election, no purpose would be served in checking the Union's claim of majority representation by a card check through a neutral third party, as the results of the election would be known prior to any conclusive determination in the third party procedure."

An election was held in both Unit A and Unit B on October 16. Neither Union nor Boilermakers received a majority vote in Unit A, and the Union lost the election in Unit B:

In reviewing the Union's authority to act as bargaining representative for the employees of Engine and Pipeline, the trial examiner considered each of the authorization cards filed by the Union with the Regional Office of the National Labor Relations Board. He concluded that on August 17 [the date of the first bargaining demand] the Union represented only 12 of the 35 employees then within the Unit; that on September 11 [the date of the second demand] it represented only 16 of the 34 employees then within the Unit; and that on October 10 [the date of the last demand] it represented only 16 of the 33 employees then

within the Unit; [4] that, therefore, Engine and Pipeline had no duty to bargain and there was no unlawful refusal as alleged in the complaint. In making this finding of lack of majority the examiner rejected, inter alia, the signed authorization card of employee Raymond Jones for the reason that there was no substantial evidence to prove that Jones had signed the card prior to the October 10 bargaining demand. The Board disagreed with this conclusion and found that "Jones' testimony sufficiently identifies the date of his signing of the union authorization card before October 10 and that the Trial Examiner's reasons for rejecting this testimony are not valid"; that, therefore, the Union represented 17 of the 33 employees within the Unit when it made its October 10 bargaining demand, hence Engine and Pipeline unlawfully refused to bargain in violation of 8(a)(5).

It was, of course, incumbent upon the Union to come forth with affirmative evidence that it held Jones' card on or before October 10. Our only duty as the reviewing court is to determine the substantiality of the evidence to support the Board's ultimate findings and conclusions from the record as a whole, including the examiner's report. The trial examiner, as does a trial court, has an opportunity to observe the witnesses he hears and sees, and his report is undoubtedly entitled to such probative force as it may intrinsically command. This probative force reaches its highest significance when an issue turns upon credibility. The Board's ultimate findings are, to be sure, entitled to great respect. But, they must, nevertheless, be set aside when the record before us, viewed in its entirety, including the body of evidence opposed to the Board's view, "precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." Universal Camera Corp. v. N. L. R. B., 340 U.

S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456; Rocky Mountain Natural Gas Co., Inc. v. N. L. R. B., 10 Cir., 326 F.2d 949. In this posture, we cannot say that the record here substantially supports the Board's rejection of its examiner's findings regarding Jones' card and substitution of its own.

Jones' card was signed but undated. Jones testified that he was given the authorization card by a fellow employee, Bodie, and that "Bodie at that time [was] an employee of the company"; that he took the card home with him, signed it and gave it back to Bodie. Jones further testified that he could not remember the date when he signed the card and that he was not sure if it could have been in September or October but he knew "it was hot—during the summertime". Union representative Willoughby testified that he received Jones' card along with Bodie's card and another about August 31, but he had no records or other evidence to support his recollection. Union representative Clark testified that he received Jones' card along with two others but did not answer a question as to when he received them. There was also evidence that the Union had inserted the date on all other cards which had been received signed but undated, but that it failed to do so on Jones' card. There was creditable evidence that the Union had filed with the Board on August 20 the cards signed on August 15 and 17; the cards signed on August 18 and 27 were filed on August 27; and the card signed on September 3 was filed on September 11. There was no evidence to explain why Jones' card and two others supposed to have been signed on August 31 were not filed with the Board until December 9. Bodie, who solicited the questioned card, was neither called as a witness nor was his absence explained. No authorization card signed by Bodie was offered into evidence.

The examiner did not believe the testimony of union representative Willough-

4. One employee was fired for cause and another voluntarily terminated his employment, thus decreasing the number of employees within the unit by 2.

by concerning when he received Jones' card. He also refused to believe portions of Jones' testimony including his recollection that the card was signed "during the summertime" because it was hot. In rejecting this evidence the examiner commented that "it is common knowledge that it can be hot in Oklahoma even in November." He also noted that Bodie's employment was terminated between September 11 and October 11, but pointed out that Bodie could "have organized on Union's behalf after he left." He thereupon rejected Jones' card as evidence that the Union represented a majority of the employees in the unit on the critical date, i. e. October 10, or prior thereto.

The Board, examining the same evidence, found that Jones' testimony pinpointed the date of signature since "Bodie Alexander at that time [when Jones was solicited to sign a union authorization card]" was an employee of the company; that while Bodie could have organized on behalf of the Union after he left his employment, "there is absolutely no evidence of this". The Board, analyzing Jones' testimony, thought that "it is far more likely to be hot in Oklahoma before October than after that date."

 It is, to be certain, within the peculiar province of the Board to draw permissible inferences from the evidence so long as they find substantial support in the record. See American Sanitary Products Company v. N. L. R. B., 10 Cir., 1967, 382 F.2d 53. But, we do not think, in this instance, the Board's inferences are fairly justifiable. Jones himself could not remember when he signed the authorization card; he testified that Bodie gave him the card while Bodie was an employee, but he did not recall when he signed and returned the card; Bodie, the only person who could be sure when he received the card, was

not a witness and no explanation was made as to why; the union representative Clark would not answer the question as to when he received the card; Jones' card was the only undated card produced, even though the Union had dated others when it received them; no explanation was offered as to why this undated card was not filed with the Board until December 9. Indeed, there was no evidence that Bodie solicited on behalf of the Union after his employment was terminated, but neither was there evidence that he did not. Equally, there was no evidence as to the weather in Oklahoma during October, 1964, to lend credence to the comments by either the examiner or the Board as to the likelihood of it being hot. We do not believe that the conclusions with respect to the critical date on which the crucial card was signed can be made to rest on such flimsy evidence and speculation. Rather, we are impelled to conclude from the record as a whole that there was not substantial creditable evidence that the Union did in fact have Jones' signed authorization card at the time it demanded Engine and Pipeline to bargain and that the trial examiner properly rejected the card as evidence. Thus we agree with the trial examiner that the Union failed to prove its majority and that the employer, therefore, never had a duty to bargain. Since, as we have seen, no one here contends that in the absence of a card majority the Union was entitled to a bargaining order, i. e. see footnote 4, supra, we need not consider whether the employer's refusal to bargain was premised upon good faith nor any other issues relating to the refusal to bargain allegations. But, see N. L. R. B. v. Logan Packing Co., No. 10,355, 4th Circuit, October 27, 1967, 386 F.2d 562.

We decline to enforce the Board's order with respect to the 8(a) (5) violations.