**A. J. KRAJEWSKI MANUFACTURING CO., Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**
and
**United Steelworkers of America, AFL–CIO, Intervenor.**

No. 7224.

United States Court of Appeals
First Circuit.

Heard April 8, 1969.

Decided July 17, 1969.

William J. Sheehan, Providence, R. I., for petitioner.

Eugene B. Granof, Washington, D. C., Atty., with whom Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and David C. Nevins, Atty., Washington, D. C. were on brief, for N. L. R. B., respondent.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

On August 24, 1966, Michael Andreoli was called to the office of his employer and summarily fired. The several issues that we consider in this case center around this event and the circumstances that triggered it.

For many months after coming into the employ of the Krajewski Company, Andreoli's performance had been satisfactory if uneventful. Then in June of 1966 he became active in union organizational matters. Union authorization cards representing a majority of the Company's employees were signed largely as a result of his efforts. Based on these cards the Union made a claim of majority status and requested that it be recognized as the bargaining agent. The Company, disparaging the value of such cards in general and doubting that its employees had signed them in any event, refused to meet the Union's de-

mands. Thereafter the parties agreed to an election. This election, held on September 14, resulted in the defeat of the Union by a vote of thirty-seven to ten.

Meanwhile, Andreoli's success as a labor organizer was paralleled by a decline in his fortunes as an employee. About two weeks before his discharge Andreoli noticed two foremen inspecting his open locker where he testified he kept, or at any rate had kept, union authorization cards. He complained of this incident to Fred Slemon, the general manager. Also, a few days later Andreoli received a warning letter charging that he had improperly questioned one Robert Bost, a customer's employee, concerning Krajewski operations on a holiday (V J Day). Finally, he had an argument with the wife of a foreman [1] (also a Krajewski employee) during which he made a vulgar remark to her. When this incident was reported to A. J. Krajewski, the president of the Company, Andreoli's dismissal resulted.

■ The Board, adopting the findings of the trial examiner, found that the Company violated §§ 8(a) (1), (3) and (5) of the National Labor Relations Act by giving the impression of surveillance of Andreoli, by discharging him and by refusing to bargain with the Union. It ordered that the election be set aside, that the Company bargain with the Union and that Andreoli be reinstated.

Turning first to the question of surveillance, we are constrained to note that the Board's determinations in this respect are extremely tenuous. Two foremen looked into the open locker of an employee. They testified that they didn't even know whose locker it was. In addition, their principal interest was that there were "three pairs of cutters" in the locker whereas each employee was supposed to have only one. Despite this the foreman took no disciplinary measures of any kind. We cannot say that

this constitutes substantial evidence of surveillance.

The trial examiner, himself troubled that this incident might appear to be of "small significance were it isolated," calls attention to "contemporary events," such as the general manager's warning letter above mentioned, and his statement to Robert Bost that Andreoli was suspected of union activity. But such events hardly provide the background for a charge of surveillance. As to the warning letter, there was evidence that before the holiday there had been grumbling among the employees concerning the possibility of working on that day. The Company was understandably agitated when it learned that an employee involved its customers in this matter by raising questions concerning which employees had been working on the holiday. It would appear, however, that to this extent it was Andreoli who had the Company under surveillance rather than the other way around. The other contemporary event, Slemon's statement that Andreoli was suspected of union activities, is equally unimpressive. Slemon denies having made the statement at all and since he is supposed to have made it to Bost just after the latter had made a most profuse expression of fealty to unions and unionism generally it is surprising that his denial was not credited. In any event, assuming that Slemon made the statement, we are unable to agree that this would convert the locker episode into surveillance or the impression of surveillance.

■ We come now to the dismissal itself. The Board found that the real reason for Andreoli's discharge was his union activities. We think this determination is supported by the circumstances of the dismissal, especially the Company's inability to adhere with consistency to any explanation for its action.

The theory now espoused by the Company is that Andreoli was fired because of the vulgar remark made to a female employee. Intrinsically there are diffi-

---

[1]. This foreman, Allison White, was one of the two men who inspected Andreoli's locker.

culties enough with this. It appears from the record that similar vulgarity was not unusual in the plant and that language-wise even the female employee in question was quite capable of giving as good as she received. In addition, despite warning from counsel not to take disciplinary action without consultation, Krajewski, after a vain effort to reach his attorney, acted on his own that very day; this despite the fact that the event was already three days old before he learned of it.

The explanation for the dismissal was weak enough even if it had been advanced with consistency. But there was no consistency to it at all. Andreoli himself was told at the time that he was being dismissed because his work was unsatisfactory.[2] This explanation has since been repudiated by the Company. Also, Krajewski told him that he would receive a letter from the Company attorney explaining the reasons for his dismissal. No such letter was sent.[3] In addition, Slemon, who was present at the firing, charged that Andreoli had improperly ordered another employee to do certain work. This was news even to Krajewski.

Also, a notice of disqualification for unemployment benefits sent to Andreoli by the Rhode Island Department of Employment Security, reads in part: "Employer information reveals the claimant's employment was terminated because of his absence from his work area without permission and for questioning a company customer regarding the operation of the plant on a holiday. * * *"[4] This is but another indication that the Company was unable to settle on a reason for the discharge, which in itself lends

support to the theory that Andreoli's union support was the real explanation. See N. L. R. B. v. Joseph Antell, Inc., 358 F.2d 880 (1st Cir.1966); N. L. R. B. v. Schill Steel Products, Inc., 340 F. 2d 568, 573 (5th Cir.1965).

■ Of course, a determination that an employee was fired because of his union activities presupposes that the employer was aware of such activities. But we do not consider this a really separate issue here. Inferences from circumstantial evidence as to the employer's knowledge are permissible, Virgin Islands Labor Union v. Caribe Construction Co., 343 F.2d 364 (3d Cir.1965), and the really extraordinary vacillation of the employer is such a circumstance. Schill Steel, *supra* at 572–573. This is true especially where, as here, the employee in question engaged in in-plant union activity and the plant is relatively small. See Joseph Antell, Inc., *supra*.

Finally, we turn to the § 8(a) (5) refusal to bargain charge. This involves two questions: (1) Did the Union have majority status in fact? See N. L. R. B. v. Midwestern Manufacturing Co., 388 F.2d 251 (10th Cir.1968). (2) If so, did the Company have a good faith doubt.

■■ In this circuit we have not felt that authorization cards are so intrinsically unreliable that a company always has a right to reject a request for recognition based on them. N. L. R. B. v. Sinclair, 397 F.2d 157 (1st Cir.), aff'd *sub nom.* N. L. R. B. v. Gissel Packing Co., (6/16/69) 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547; N. L. R. B. v. Southbridge Sheet Metal Works, Inc., 380 F.2d 851 (1st Cir.1967). In this

---

2. It is true that Krajewski gave this explanation only when prodded by Andreoli but refusal by the employer to give a reason for firing an employee may itself be a reason for inferring a discriminatory discharge. N.L.R.B. v. Plant City Steel Corp., 331 F.2d 511, 515 (5th Cir. 1964).

3. The Company attorney explains that fear of a libel suit dissuaded him from writing such a letter.

4. This notice is not, of course, authority for the truth of the allegations contained therein but it does indicate further vacillation on the part of the employer as to why the employee was fired. In view of the fact that Andreoli identified the notice at the hearing, we think that it was sufficiently authenticated for our purposes.

case the trial examiner concluded that in no instance had the signer of a card been told that the only purpose of such cards was to get an election and further that "neither fraud nor misrepresentation nor coercion" was used in obtaining them. We think that substantial evidence supports this finding. It is not necessary to analyze in detail the testimony regarding the numerous cards challenged by the Company.[5] For the most part it is enough to say that the cards were clear and unambiguous on their face [6] and there has been no showing of misrepresentation. See Amalgamated Clothing Workers of America v. N. L. R. B., 365 F.2d 898, 906–907 (D.C.Cir.1966).

■ One problem, however, is worthy of comment. There was testimony to the effect that certain of the signers were not fluent, at least in the English language. This is certainly pertinent. It largely negatives as to such signers, for instance, any inference from the fact that the purpose of the cards clearly appears on their face. See N. L. R. B. v. Dan Howard Manufacturing Co., 390 F.2d 304 (7th Cir.1968). Still, the issue is whether the purpose of the cards was adequately communicated to the signers, not whether they read them. See N. L. R. B. v. Gordon Manufacturing Co., 395 F.2d 668 (6th Cir.1968). To hold otherwise would, it is true, lessen the likelihood that uneducated workers would be victims of fraudulent practices but it would have the collateral effect of inhibiting organizational efforts among workers who are perhaps most in need of collective economic strength. With special attention to the testimony regarding workers who did not or who were unable to read the cards, we conclude that the determination of the Board that their signatures were not obtained by misrepresentation is supported by substantial evidence.

We need not pursue the present effect of a good faith doubt on the employer's part. See discussion in N. L. R. B. v. Gissel Packing Co., *supra.* Following the Court's decision in *Gissel,* counsel for the Board informed us that remand, such as was made in *Gissel* itself, in order for the Board to review its findings in the light of that decision may be an appropriate disposition at this time.

While, except for the matter of surveillance, we might be disposed to affirm the present decision of the Board the desirability of consistent Board practice in the light of *Gissel* dictates the adoption of the Board's suggestion.[7]

The case is remanded to the Board for further proceedings consistent with this opinion.

---

5. There were fifty-five employees of whom thirty signed cards. The Company challenges thirteen of these cards.

6. "I hereby request and accept membership in the UNITED STEELWORKERS OF AMERICA, A.F.L.-C.I.O., and of my own free will hereby authorize the United Steelworkers of America, A.F.L.-C.I.O., its agents and representatives, to act for me as a collective bargaining agency in all matters pertaining to rates of pay, wages, hours of employment, or other conditions of employment."

Compare N.L.R.B. v. Southland Paint Co., 394 F.2d 717, 730 (5th Cir. 1968) where the court attached significance to the fact that the card contained no reference to signer's membership in the Union.

7. We do not deal with the company's contention that Andreoli should be reinstated because it has been discovered that he falsified his job application. This point was not raised before the Board. See § 10(e) of the Act, 29 U.S.C. § 160(e).