## NATIONAL LABOR RELATIONS BOARD, Petitioner.

### v.

## PEARL BOOKBINDING COMPANY, INC., Respondent.

### No. 75–1002.

United States Court of Appeals, First Circuit.

Argued May 6, 1975.

Decided June 13, 1975.

---

16. Poller v. Columbia Broadcasting System, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962).

Corina Lothar Metcalf, Atty., Washington, D. C., with whom Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Assoc. Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., were on brief for petitioner.

Julius Kirle, Boston, Mass., for respondent.

LEVIN H. CAMPBELL, Circuit Judge.

The National Labor Relations Board, pursuant to section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e), petitions for enforcement of two Board decisions and orders issued against Pearl Bookbinding Company for violations of sections 8(a)(5) and (1) of the Act. The Company urges that enforcement be denied on the merits of the Board's decisions and on the ground that the company has complied with the Board orders.

The company is engaged in the binding of pamphlets for the printing trade at its plant in South Boston, Massachusetts. Following a Board-conducted election on January 21, 1972, the Board on January 31 certified Local 16 of the International Brotherhood of Bookbinders as the bargaining agent for the company's maintenance and production employees. The subsequent bargaining sessions resulted in an impasse, and on April 25, 1972, the union went on strike. Negotiations during the next month failed. The strike continued for several months without further bargaining sessions, and during that time there was an active picket line. Sporadic incidents of violence occurred. A company foreman, accompanied by the company lawyer, filed criminal charges against a union functionary (not an employee at the company) for pointing a gun at several persons on the company's shipping dock from his car in an outside parking lot. Also the company filed an unfair labor practice charge against the union for strike misconduct under section 8(b)(1)(A) of the Act. There were a number of contacts between the company and union concerning these matters, as well as the question of reinstating certain employees still on strike. These matters were largely resolved by the end of August, 1972. The criminal charges were dropped on August 22, the unfair labor practice charge was dropped on August 25, the union called off the strike on August 25, and the question of reinstatement remained unresolved.

In a letter dated September 10, 1972, but not mailed until October 10, 1972, the union requested that the company resume negotiations. The company received the letter and made no response. The union filed an unfair labor practice charge against the company for refusing to bargain. At the hearing the company took the position that although an employer normally must bargain with a Board-certified union for a year in the absence of unusual circumstances, *Brooks* v. *NLRB,* 348 U.S. 96, 98, 75 S.Ct. 176, 99 L.Ed. 125 (1954), two circumstances here relieved it of that duty: first, the Bookbinders had merged with the Lithographers and Photoengravers International Union with the result that Local 16 became Graphic Arts Local 16B; and, second, during the strike the union had abandoned and disclaimed its status as bargaining representative for the company employees. Rejecting both defenses, the administrative law judge found the company to be in violation of sections 8(a)(5) and (1) and recommended that the Board order the company to bargain. The Board adopted the administrative judge's findings and conclusions and issued the recommended order on October 31, 1973.[1] 206 N.L.R.B. No. 192.

On December 5, 1973, the union received notice from the Board regional office of the company's compliance with the order. On December 7, 1973, union president Carlsen phoned and then wrote a request that the company provide the names, addresses, rates of pay, and classification of all employees (numbering about 32) prior to the first negotiating session. The company took no position on the union's request then, nor at the first bargaining session on December 21, 1973. Carlsen inquired as to which employees on the pre-strike list (the union had this list) were still employees, and company lawyer Kirle thereafter gave the names of 16 on the pre-strike list

---

1. The Board extended the initial year for bargaining following certification to include a period equivalent to the time between the company's refusal to bargain and the initial expiration date of the certification year.

who were no longer employees. On December 30, Kirle phoned Carlsen and stated the company would not provide the current list of employees because the company did not wish them harassed. Carlsen responded that he would keep the information in confidence. Kirle later provided the classifications and rates of pay of each employee, but not the names and addresses. The company did not offer to assist the union in communicating with bargaining unit employees, such as by posting notices, permitting handbilling on its property, or giving the names and addresses to an independent mailing service. The union filed an unfair labor practice charge.

The administrative law judge found that the company did not have any good-faith fear of violence or harassment and did not offer a feasible alternative to names and addresses, that the information was relevant and necessary to the union in performing its duties as bargaining agent, and that alternative means of communicating with the employees were not available. The Board, affirming the administrative judge's findings, held the company to be in violation of sections 8(a)(5) and (1) and ordered the company to provide the information presently and on a continuing basis and to bargain with the union.[2] 213 N.L.R.B. No. 87 (Sept. 25, 1974).

Since the issuance of the order, the company has furnished the list, and negotiations have resumed. The Board has sought enforcement of this order and the earlier one, on the ground that without a judicial decree and the threat of contempt, the company might repeat its past misconduct. The company contests this argument, as well as the merits. Thus, we are called upon to review the Board's findings of unfair labor practices in the two proceedings, and then to determine whether under the circumstances court enforcement of the Board's orders is appropriate.

With respect to the first proceeding, the company contends that it had no duty to bargain for two reasons. First, it argues that after the merger the local lost its identity as the representative of the employees. The company points out that at the time of the merger referendum vote in February, 1972, employees at the company were not yet members of the local and thus did not have an opportunity to vote on the merger. This fact, in the company's view, is significant because the local after merger was subordinate to a new international with a new president and constitution.

■■ We believe the company must fail on this issue. Although the employees did not actually vote on the change of affiliation to a merged international, they were informed in English and Spanish of the possibility of the merger and its consequences prior to the time of the representation vote. On the basis of undisputed evidence, the Board found that 21 of the 27 unit employees signed authorization cards reflecting sponsorship by the Lithographers (the other union in the merger) in case the merger antedated certification of the Bookbinders Local 16. Cf. NLRB v. Franks Bros. Co., 137 F.2d 989, 992 (1st Cir. 1943), aff'd, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 435 (1944). But see Dickey v. NLRB, 217 F.2d 652, 655 (6th Cir. 1954). More significantly, the company has failed to show that the successor union is substantially different—other than in name and affiliation—from the prior union. See NLRB v. Commercial Letter, Inc., 496 F.2d 35 (8th Cir. 1974); Retail Clerks Int'l Assn. v. NLRB, 125 U.S.App. D.C. 389, 373 F.2d 655 (1967); Carpenteria Lemon Assn. v. NLRB, 240 F.2d 554, 557 (9th Cir. 1956); Franks Bros., supra. To the contrary, the Board found, and its finding is supported by substantial evidence from the record as a whole, 29 U.S.C. § 160(e), that Local 16 underwent no change. It did not merge with another local; its structure, administration, officers, assets, membership, autonomy, by-laws, size, and territorial jurisdiction remained the same; and the local contin-

---

2. The year of certified status was again extended to compensate for the time lost during the unfair labor practice. See note 1 supra.

ued to negotiate contracts with employers on behalf of employees it represented, and to administer collective-bargaining agreements to which it was a party. In similar circumstances, where the new local was found to be basically a continuation of the old bargaining representative, but involved a merger of two locals as well as of two internationals, one court recently has held that there is no requirement that prospective members be allowed to vote on the changes, at least in the absence of a showing that the votes of those employees could have changed the result of the election.[3] *Commercial Letter, supra,* 496 F.2d at 40–41.

We conclude that the merger of the two internationals was not attended by any of the "unusual circumstances" cited in *Brooks, supra,* which would terminate the duty to bargain—such as a dissolution of the bargaining representative, transfer of affiliation as a result of a schism,[4] or change in the size of the bargaining unit. Given the substantial continuity found to exist here, it would be inimical to the purpose of industrial peace relied on in *Brooks* were a company allowed to refuse to bargain on the ground advanced.[5]

The company's second reason for disavowing any duty to bargain is that the union disclaimed or abandoned its position as the employees' bargaining representative. At the Board hearing, company counsel Kirle testified that on several occasions in early August, 1972, union president Carlsen and union counsel Cappellano said the union was going to withdraw from the negotiations. The company observes that such an attitude by the union would be reasonable to expect,

since a majority of the strikers had gone back to work and others had been replaced, and the union wanted the criminal and unfair labor practice charges dropped. To a limited extent Kirle's testimony was corroborated by that of company president Liebman. However, Carlsen and Cappellano denied making the alleged statements of disclaimer or abandonment. The administrative law judge reviewed the entire background of the strike-related disputes, as well as the conflicting testimony, and credited the testimony of the union officials rather than that of Kirle.

The judge's findings make it inappropriate for us to inquire whether a disclaimer such as is alleged could have absolved the company from its duty to bargain within a year of certification.[6] This court's function is limited to deciding whether on the record as a whole there is substantial evidence to support the Board's findings. Here there was ample supporting evidence. We have said that Board findings on credibility must stand unless they are beyond the bounds of reason. *See, e. g., NLRB v. Universal Packaging Corp.,* 361 F.2d 384, 387–88 (1st Cir. 1966). It was not unreasonable for the Board to find that the union's one-month delay in mailing the September 10 letter requesting further negotiations was due to Kirle's suggestion to Carlsen that bargaining should be delayed until the heat from the criminal charge had subsided. Nor, in light of the respective postures of the company and union on the abandonment claim, was it beyond the bounds of reason for the Board to credit the testimony of the union officials rather than Kirle on each critical factual issue.[7] The fact that the administrative judge's opinion did not re-

**3.** The vote of the approximately 28 company employees would not have affected the outcome of the referendum on the merger, which was approved by a vote of about 24,000 to 6,000.

**4.** The Board found that at no time before or since the merger had any dissident group appeared or claimed to be the old Bookbinders Local 16.

**5.** The company also contends that it was under no obligation to bargain with the local

after merger because the company received no official notification of the change. In view of the company's admitted knowledge of the proposed merger, this argument is without merit.

**6.** It is undisputed that the company received a letter from the union on October 11, 1972, requesting resumption of negotiations, and that the company made no response.

**7.** The company would require the drawing of an inference against the union from the NLRB

but every statement made by Kirle to support his recollections. does not establish that the Board failed to consider the entire record, including the unfavorable matter, under *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The company's final claim on the merits is that the Board, in the second proceeding, erred in finding the company in violation of the Act for refusing to supply the union with the names and addresses of the unit employees. The company does not dispute that the union must be able to communicate with the bargaining unit employees in order to bargain for them, but argues that adequate alternative means of communication existed which justified the company's refusal to provide the list of names and addresses. In addition the company contends that its fear of employee harassment justified its refusal to supply the list. *See Shell Oil Co. v. NLRB,* 457 F.2d 615 (9th Cir. 1972).

■ There is no general rule requiring an employer to give the bargaining agent a list of the unit employees' names and addresses. However, courts have imposed such a requirement when the information is relevant and necessary to the union's performance of its duties. *See United Aircraft Corp. v. NLRB,* 434 F.2d 1198, 1204–05 (2d Cir. 1970), *cert. denied,* 401 U.S. 993, 91 S.Ct. 1232, 28 L.Ed.2d 531 (1971); *Prudential Ins. Co. v. NLRB,* 412 F.2d 77, 83–84 (2d Cir.), *cert. denied,* 396 U.S. 928, 90 S.Ct. 263, 24 L.Ed.2d 226 (1969); *Standard Oil Co. of Cal. v. NLRB,* 399 F.2d 639, 640 (9th Cir. 1968). The existence of a duty thus depends on the factual circumstances in each case.

■ The company asserts that the union could have distributed handbills to employees from a public street 160 feet

from the employee entrance. However, the Board found that handbilling was not a feasible means to communicate in view of the past difficulty in getting walking and riding employees to take handbills, a difficulty which continued during the company's effective isolation of the employees from the union during litigation over the company's refusal to bargain. It is true that the union's own diligence is questionable. Moreover, the union had the names of 16 employees and only tried to enlist the aid of one of them. However, the turnover rate in the company was high, and none of the current employees was a member of the union. We believe that the Board's judgment that the list of names and addresses was necessary, there being no adequate alternative means of communication, is sufficiently supported in the record.

The company further contends that even if the list were relevant and necessary to the union's duty, the company's fear of violence and harassment justified its refusal to provide the list. The company relies on *Shell Oil, supra,* 457 F.2d at 619, where the court held the employer to have a reasonable, good-faith concern over abuses of an employee list, in view of "a clear and present danger of harassment and violence".

■ Here, by contrast, the Board found that there was no similar evidence of violence or harassment during the 16-month period between the end of the strike and the union's request for the names and addresses. The only evidence of post-strike harassment was an alleged statement about one employee, ambiguous on its face, which might be taken as a veiled threat. There is substantial evidence in the record to support the Board's finding that the company had no good-faith fear of violence or harass-

General Counsel's failure to call a Board agent, who had been attempting to settle the strike, · to testify as an impartial observer as to what was said relating to abandonment. We see no reason to draw any such inference. We are told that it is Board policy, for various practical reasons, not to call its agents unless their conduct is impugned. We cannot say that the

policy is so unreasonable as to require the sanction sought by the company. It is not represented that the company made a timely request to call the agent as its own witness or that the Board would have declined to cooperate had such a request been made. *See* 29 C.F.R. §§ 101.10(a) and (b)(2).

ment, but rather was seeking to continue to isolate the employees from the union.

 Having found no error in the Board's decision on the merits, we turn to the question of the appropriateness of enforcing the Board's orders with which, for the time being at least, the company is complying. The company has not conceded the illegality of its conduct, and the Board's orders impose requirements which the company might at some future time disavow. The case is not moot nor does present compliance deprive this court of power to decide the disputed issues. *See NLRB v. Mexia Textile Mills,* 339 U.S. 563, 567 and n.4, 70 S.Ct. 826, 94 L.Ed. 1067 (1950). Here the company's refusal to bargain and furnish information has been seen as part of a studied effort to erode the union's position and insulate employees from their bargaining agent. The tactics apparently met with success for several years. On this history the Board may reasonably desire the finality of judicial resolution of its own decisions as well as a court order to serve as a pointed deterrent against resumption of the illegal practices.

Enforcement granted.