**P.S.C. RESOURCES, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 77–1389.

United States Court of Appeals,
First Circuit.

Argued March 9, 1978.

Decided May 12, 1978.

Sanford A. Kowal, Boston, Mass., with whom Sallop, Kowal & Davis, Assoc., Boston, Mass., was on brief, for petitioner.

Wyneva Johnson, Atty., Washington, D. C., with whom Michael S. Winer, Atty., John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., were on brief, for respondent.

Before CAMPBELL and BOWNES, Circuit Judges, PETTINE, Chief Judge.*

* Of the District of Rhode Island, sitting by designation.

PETTINE, Chief District Judge.

Petitioner P.S.C. Resources refines waste oil. During the period relevant to this case, at the Watertown, Massachusetts facility, five drivers under the direction of the manager, John Lee, were responsible for soliciting, purchasing and collecting waste oil that was thereafter shipped to petitioner's refineries. The drivers were paid a weekly salary, regardless of the amount of oil they collected, but they also received incentive bonuses depending on their weekly collection record. Following a meeting in late February/early March, 1976 with petitioner's general manager, William White, at which grievances were aired, the drivers began to discuss joining a union. On May 6, 1976, four drivers, including Thomas Carleton, signed union authorization cards. On May 13, 1976, Carleton was dismissed by Lee.

In this petition for review and cross-application for enforcement of a decision and order of the National Labor Relations Board, we are called upon to review the Board's findings that petitioner committed several unfair labor practices. In specific, the Board adopted, without discussion or alteration, the substantive findings of the Administrative Law Judge ("ALJ") that petitioner coercively interrogated its employees and created an impression of surveillance in violation of § 8(a)(1) of the National Labor Relations Act ("Act"), 29 U.S.C. § 158(a)(1) (1970), and that petitioner discharged Thomas Carleton because of his union activities in violation of § 8(a)(1) and (3) of the Act, 29 U.S.C. § 158(a)(1), (3).

▌ Our review is limited to "whether on the record as a whole there is substantial evidence to support the Board's findings." *NLRB v. Pearl Bookbinding Co.*, 517 F.2d 1108, 1112 (1st Cir. 1975). Deference to the inferences drawn by the ALJ who heard and observed the witnesses first-hand is particularly required in our review of discriminatory discharges wherein the employer's motive is the key. *Trustees of Boston University v. NLRB*, 548 F.2d 391, 393 (1st Cir. 1977). Of course, credibility judgments stand "unless they are beyond the bounds of

reason." *NLRB v. Pearl Bookbinding Co., supra*, 517 F.2d at 1113.

## I. Coercive Interrogation and the Impression of Surveillance

The ALJ's findings that petitioner's manager, John Lee, coercively interrogated employees and gave them an impression of surveillance is based on both Lee's testimony and the testimony of employees. Lee testified that he began asking employees if they knew anything about the union in the fall of 1975. His inquiries were at the behest of the president of petitioner who was "concerned" about the rumor Lee reported that the men at the Watertown facility were organizing a union. Lee was informed in late 1975 or early 1976 that a concentrated effort to unionize had been launched. Lee gave no indication in his testimony that his inquiries ever ceased. In light of his boss' directive and the information Lee received of increased union activity, the ALJ correctly inferred that Lee's questioning continued well into 1976. To all his questions with one exception, Lee testified that the employees indicated their ignorance of any union activity.

Employees testified that Lee asked them individually if they knew anything about the union on several occasions, including in May, only a few days after they signed union cards and several days prior to Carleton's discharge. In response to the May questioning, Mr. Giordano testified that he told Lee the men had signed union cards. Mr. Anderson stated that Lee asked him if he, Anderson, started the union and that Lee said he knew Anderson held a union card. Anderson replied that he did not start the union, that the company knew when it hired him that he held a card and that he had also signed a union authorization card. In response to Lee's further question about who gave him the authorization card, he answered that he did not remember. Mr. Purcell reported that Lee twice asked him if he knew anything about the union and twice stated that Lee knew that Purcell did indeed know something. Both times, Purcell lied and denied any

knowledge because he was afraid he "might be out the door" if Lee thought he was involved in the union.

■ The ALJ found that Lee's conversations with Purcell, whose testimony he credited, had created an impression of surveillance. We agree that Lee's expressions of knowledge of Purcell's union activities were intended to and did in fact give Purcell an impression of surveillance in violation of § 8(a)(1). *See, e. g., NLRB v. Prince Macaroni Manufacturing Co.*, 329 F.2d 803, 805–06 (1st Cir. 1964); *cf. NLRB v. Simplex Time Recorder*, 401 F.2d 547 (1st Cir. 1968).

■ Several factors persuasively support the ALJ's finding that Lee coercively interrogated the employees. *See generally Bourne v. NLRB*, 332 F.2d 47, 48 (2d Cir. 1964), *cited in Chauffeurs, Teamsters and Helpers Local 633 v. NLRB*, 166 U.S.App. D.C. 157, 160, 509 F.2d 490, 493 (1974) *and in Corriveau & Routhier Cement Block v. NLRB*, 410 F.2d 347, 349 (1st Cir. 1969). The interrogation was not an isolated incident but occurred repeatedly over the course of several months. *Compare with Chauffeurs, Teamsters & Helpers, Local 633 v. NLRB, supra*, 166 U.S.App.D.C. at 162, 509 F.2d at 495. Although the questioning was generally informal and performed by Lee who was not a top executive of the company, Lee had sole control over discharge decisions. Inquiries by a man in Lee's position could and did suggest to at least Purcell that a pro-union answer would result in reprisal. *See NLRB v. Kelly & Picerne, Inc.*, 298 F.2d 895, 898 (1st Cir. 1962) (impact on employees determinative of legality). *Compare with NLRB v. Prince Macaroni Manufacturing Co.*, 329 F.2d at 806 (employee who spoke "freely" of union activities was not intimidated by questioning). The impression of reprisal is further reinforced by the fact that Lee's inquiries were not simply general but asked for identification of the instigator. Lastly, Lee admitted that he told the employees that another of petitioner's facilities had ceased operations in reaction to a union organizing effort and that the Watertown facility might likewise close, leaving them all with-

out jobs. He further admitted that he had in fact no reason to believe the company planned to close the Watertown facility. The ALJ noted that such a threat of plant closure would constitute a violation of § 8(a)(1) but did not consider it because the conversation may have occurred beyond the period covered by the complaint. However, such a statement contributes to the climate of coerciveness that surrounded the subsequent interrogation. *See Corriveau & Routhier Cement Block, Inc. v. NLRB, supra*, 410 F.2d at n. 2.

## II. Discharge of Carleton

■ Whether the "dominant" reason for the discharge of Carleton was his union activities rather than his work performance is a more difficult question. To find a violation of § 8(a)(1) and (3), "[w]here there are both proper and allegedly improper grounds for discharge, the Board's burden is to find affirmatively that the discharge would not have occurred but for the improper reason." *Coletti's Furniture, Inc. v. NLRB*, 550 F.2d 1292, 1293–94 (1st Cir. 1977). Like so many other cases this Court has had occasion to review, *e. g., NLRB v. South Shore Hospital*, 571 F.2d 677 (1 Cir. 1978); *A. J. Krajewski Manufacturing v. NLRB*, 413 F.2d 673, 676 (1 Cir. 1969); *NLRB v. Pioneer Plastics Corp.*, 379 F.2d 301, 306 (1 Cir. 1967); *NLRB v. Joseph Antell, Inc.*, 358 F.2d 880 (1 Cir. 1966), at issue preliminarily is whether the Board has sustained its burden of showing that the petitioner knew of Carleton's union activity. *Stone & Webster Engineering Corp. v. NLRB*, 536 F.2d 461, 464 (1st Cir. 1976). The evidence that Lee knew of union activity among the men generally, including Carleton, is quite strong. The combination of Lee's independent information about the union drive, the fact that the drivers, including Carleton, gathered to discuss the union in full view of Lee and which Lee admits observing although he denies he knew what they were discussing, the testimony of Giordano and Anderson that they told Lee about the union efforts before Carleton's discharge, Lee's admission that

Giordano may indeed have told him about the union prior to discharge, the smallness of the plant and, finally, the telephone call from the NLRB on the day of Carleton's discharge asking Lee if he had received their "literature," all establish that Lee knew of the union activities of all four drivers, including Carleton.

The fact that Lee did not fire all four drivers but only Carleton bears on the ultimate question of whether Carleton's union activities were the "dominant" reason for the discharge. Petitioner argues that if union activities were the motive, Lee should have fired all the men; that the only factor that distinguished Carleton from the other three was not his union participation but rather his poor job performance and misconduct which allegedly formed the basis for the discharge. Only one incident supports circumstantially respondent's position that Lee believed Carleton to be the instigator. In late April, Lee passed through the group of drivers who had been discussing the union. While one driver motioned for silence, Carleton said that he did not care if Lee heard, since the men had already signed union cards. Carleton testified that he spoke loud enough for Lee to hear but that he did not know if Lee actually heard. The ALJ found only that it was "quite possible" that Lee had heard this remark and consequently had singled Carleton out as the leader.[1] In addition to this incident, Lee testified that based on past encounters, he perceived Carleton to be quite outspoken about his grievances. Lee may have inferred from this characteristic that Carleton was the union instigator.

Standing alone, this evidence would not persuade us that Carleton's union activities were the basis for the discharge. See *NLRB v. Pioneer Plastics Corp.*, supra, 379 F.2d at 306. However, the evidence that the reasons petitioner has offered for the discharge are "inconsistent with its previous practice, against its apparent interest and inconsistent with its subsequent actions," *Joseph Antell, Inc. v. NLRB*, supra, 358 F.2d at 883 (*Malone Knitting*, companion case), *quoted in NLRB v. South Shore Hospital*, at 684, sufficiently compensates for the other weak links in respondent's case.[2] Four incidents were cited by Lee at trial as forming the basis for Carleton's discharge. In February, 1976, Carleton and Anderson collected oil that had so much water in it that it was nearly worthless. However, no warning nor disciplinary order issued. In March, 1976, Carleton initially resisted driving the truck Lee had ordered him to drive but he eventually complied with Lee's order. The most serious incident occurred in mid-April when Lee ordered Carleton to pick up a supply of oil in New Hampshire. Reluctant at first, Carleton did eventually make the pick-up but was unable to collect any additional oil, although, according to his logs, he solicited at 10–15 places. Upon his return, Lee reprimanded Carleton for taking a lunch break and for not making more stops to improve his day's oil total which was far below Carleton's average. Breaking with his usual practice, Lee also called some of the stops Carleton had listed on his log; two of the stations reported that Carleton had never stopped there. When confronted with this report by Lee, Carleton insisted to Lee he had made all the stops logged; however, he admitted at trial that in fact he had not. Carleton also told Lee he was not going to "bust his hump" for the company. By the end of the discussion, Lee felt Carleton had

---

1. Although both Giordano and Anderson testified that Lee and petitioner's general manager, William White, said that the troublemaker, Carleton, was fired because of his union activity, the ALJ did not consider this testimony because of the witnesses' apparent confusion, Lee's and White's denials and the unlikelihood that White would be so foolish as to make such an admission. In deference to the ALJ's credibility determinations, we too will not consider this direct evidence of motive.

2. The ALJ, after careful scrutiny of the company's stated reasons for discharge, concluded that the reasons were "so baseless and pretextual" that the inference of an improper motive could be drawn. *Compare with NLRB v. South Shore Hospital*, supra (neither trial examiner nor the Board considered alleged proper grounds for discharge).

"mellowed" and consequently took no disciplinary action against him. The fourth and final incident was similar to the first incident in February. On May 11, Carleton reported to Lee what he thought was a good source of oil. After testing a sample, Lee authorized Carleton and Anderson to make a purchase. On May 12, Carleton and Anderson filled each of their trucks, with one driver positioned on the top of his own truck to make sure water was not coming in, while the other held the pump, skimming the oil off the top of the supply tank. Upon their return, Lee pronounced the entire load junk because too much water was mixed in with the oil. After agreeing to wait overnight to let the mixture settle, the next morning, May 13, Lee found that some oil was salvageable and had the remaining water returned to the seller who reimbursed petitioner in full for the water.[3] Carleton's truck had only between 700–1000 gallons of salvageable oil while Anderson's contained between 1400–1600 gallons of oil, the equivalent of Anderson's daily average. Anderson and Carleton began their normal routine at 10:00 a. m. without any indication from Lee that disciplinary action was contemplated. Late that afternoon Lee received a call from the NLRB inquiring whether he had received any of their "literature." Upon Carleton's subsequent return, Lee told him he was fired. According to Lee's pretrial affidavit, he gave as a reason only that Carleton had tied up two trucks. When Carleton demanded more reasons, according to both Carleton and Anderson, Lee refused to give any reason. According to Lee's trial testimony, he then recited the four incidents.

Although this catalogue of employment problems is substantial, several factors persuasively indicate that these reasons were not the dominant reason for the discharge. Most significantly, even Lee admitted that Carleton had a good record for quality and quantity oil and that he could not recall any alterations for the worse following Carleton's April expression of unwillingness to make an extra effort. The most important job qualification—the ability to collect large quantities of oil—Carleton more than adequately satisfied. In addition, at the time of the discharge, the company was particularly short-handed. A persistent record of low oil collection consistently motivated Lee's decision to discharge in the past; it was not his general practice to discharge for occasional bad days such as Carleton had. Water mixed with oil to varying degrees was a daily occurrence that never occasioned even a warning. Admittedly, both the first and last incidents involved unusually large quantities of water, however, on neither occasion was Anderson, Carleton's partner, so much as warned.[4]

■ Lee's reaction after each incident further belies petitioner's position. No disciplinary action was even threatened after any of the incidents. Even after the last

**3.** Although petitioner suffered no out-of-pocket loss, petitioner claims that it lost the daily intake of oil of the driver, Purcell, who had to return the water. The return took over five hours to accomplish because of a peculiar feature of Purcell's truck which Lee was aware of. Since both Purcell and Lee indicated that Lee may have not known of Purcell's unexpected delay until after Carleton was discharged, the delay probably did not play a part in the decision to dismiss.

**4.** Petitioner contends that the failure to fire Anderson, a known union card-holder, argues in favor of its position. Petitioner points out that Carleton's truck returned on May 12 with considerably less oil than Anderson's and that Carleton was in the position to monitor his truck's intake of water. Even if Carleton was at fault for his truck's waterload, Lee testified that he did not know what position each man held. Although as an afterthought, Lee said the discrepancy between Anderson's and Carleton's loads may have "contributed" to the discharge, he primarily relied on the fact that this pick-up was Carleton's idea, not Anderson's, to support his decision to dismiss. As to selection of the source, Carleton at worst made a good faith mistake; in truth, the selection, approved by Lee, was probably sound but the manner of pumping was faulty.

As to the first incident, Lee distinguished Carleton's role from Anderson's based on alleged statements by Anderson and another driver that Carleton was in charge of the operation. Not only were these statements denied, but also Carleton was an unlikely supervisor since the other drivers had many more months of experience than Carleton, who had been on the job only two months at the time.

incident, Lee gave no indication of his intentions, allegedly formulated the night before, simply because, he explained, he "did not feel like it." In fact, Lee's actions the day of dismissal facilitated Carleton's return to a normal routine. Most telling is the fact that Lee discharged Carleton within an hour or two of the NLRB telephone call. In contrast to Lee's delayed reaction following the last incident, Lee immediately called Carleton to task after the New Hampshire episode. However, even after that more serious confrontation, Lee continued to have faith in Carleton's ability to work hard for the company. At trial, Lee's testimony that he might have fired Carleton then if he had known Carleton had lied to him about his stops necessarily implies that Lee was convinced at the time by Carleton's explanation that Carleton had in fact made the stops. Thus, Lee may not have even actually considered seriously the charge of falsifying records, the most grievous charge presently against Carleton. *See Trustees of Boston University v. NLRB, supra,* 548 F.2d at 393. The discrepancy between Lee's trial testimony and his pretrial statement with respect to the reasons he gave Carleton for discharge cast further suspicion on petitioner's present reliance on all four incidents.[5] *See NLRB v. Teknor-Apex Co.,* 468 F.2d 692, 694 (1st Cir. 1972); *A. J. Krajewski Manufacturing Co. v. NLRB, supra,* 413 F.2d at 676.[6]

## III. Procedural Errors

Petitioner has also raised various procedural errors, none of which require reversal.

**5.** The portion of the pretrial statement that the ALJ relied upon for this inference was read into the record but never formally marked for identification nor admitted into evidence. The Board refused to reopen the record to admit the full statement. In response to petitioner's appeal, we find no prejudicial error in the Board's refusal.

**6.** The testimony of both Carleton and Anderson, that after giving only one reason, Lee refused to state any reasons at all also gives rise to an inference of discriminatory discharge. *See A. J. Krajewski Manufacturing v. NLRB, supra,* 413 F.2d at n. 2.

**7.** Section 102.118(b)(1) provides:

Petitioner first claims that it was denied procedural due process because, pursuant to Board Regulation 29 C.F.R. §§ 102.118(a), (b)(1),[7] both general counsel and the ALJ denied access to pretrial statements of general counsel's witnesses, all employees of the company, until after the witnesses had testified at trial.

■ Board proceedings must conform to the due process requirements of the fifth amendment and "so far as practicable, be conducted in accordance with the rules of evidence . . .." Section 10(b) of the Act, 29 U.S.C. § 160(b). However, neither of these restrictions requires the Board to grant the full panoply of pretrial discovery weapons available to litigants in federal court. *NLRB v. Interboro Contractors, Inc.,* 432 F.2d 854, 857–860 (2d Cir. 1970), *cert. denied,* 402 U.S. 915, 91 S.Ct. 1375, 28 L.Ed.2d 661 (1971); *NLRB v. Vapor Blast Manufacturing Co.,* 287 F.2d 402 (7th Cir. 1961), *both cited in D'Youville Manor v. NLRB,* 526 F.2d 3, 7 (1st Cir. 1975); *NLRB v. Valley Mold,* 530 F.2d 693, 694–95 (6th Cir. 1976). Based not only on the cost and inconvenience full discovery would impose on administrative proceedings but also on the peculiar nature of a labor dispute, the Board has refrained from authorizing full discovery. Board witnesses and other persons with relevant information are typically employees of the company defending an unfair labor practice charge. The company's position of control over these persons' livelihoods mandates protection that is not

Notwithstanding the prohibitions of paragraph (a) of this section, after a witness called by the general counsel or by the charging party has testified in a hearing upon a complaint under section 10(c) of the act, the trial examiner shall, upon motion of the respondent, order the production of any statement (as hereinafter defined) of such witness in the possession of the general counsel which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the administrative law judge shall order it to be delivered directly to the respondent for his examination and use for the purpose of cross-examination.

usually necessary in ordinary litigation. Thus, for example, the Board authorizes pretrial depositions only upon a showing of "good cause." 29 C.F.R. § 102.30. While courts differ over whether that requirement can be satisfied by simple discovery needs, *NLRB v. Miami Coca-Cola Bottling Co.,* 403 F.2d 994, 996 (5th Cir. 1968); *NLRB v. Safway Steel Scaffolds Co.,* 383 F.2d 273 (5th Cir.), *cert. denied,* 390 U.S. 955, 88 S.Ct. 1052, 19 L.Ed.2d 1150 (1967), or whether deposition is authorized only "for the purpose of obtaining and preserving evidence for trial," *Title Guarantee Co. v. NLRB,* 534 F.2d 484, 487 (2d Cir. 1976), the Board's regulations are in either view more limited than the federal rules of civil procedure. *NLRB v. Valley Mold, supra,* 530 F.2d at 694–95.

■ The specific regulation at issue in the instant appeal permits access to a Board witness' pretrial statement taken by the Board staff only after the witness has testified and only for the purpose of cross-examination. The Board regulation is similar to the Jencks Act, 18 U.S.C. § 3500, which makes available in a criminal trial, a pretrial statement of a government witness after direct examination. Since criminal defendants are only entitled to pretrial statements after the witness has testified, a fortiori, a defendant in an unfair labor practice proceeding before an administrative agency is not constitutionally entitled to more. Not only is the defendant's interest less in a labor dispute, but the need to protect witnesses from reprisal is even more compelling, as a general rule, since the defendant is the witness' employer. The danger of reprisal is not vitiated simply because the identity of the employee will

eventually be revealed when he testifies. If the employer had access to the statement before trial, the employer could effectively discourage the employee from testifying and thus frustrate enforcement of the Act.

The regulation, on its face at least, is totally consistent with a full and fair adjudication process. The Board's judgment in this sensitive area of employee protection is particularly entitled to respect, *see Goodfriend Western Corp. v. Fuchs,* 535 F.2d 145, 147 (1st Cir. 1976) (per curiam); *Title Guarantee Co. v. NLRB, supra,* 534 F.2d at 492.[8] Courts, including this Circuit, have accordingly upheld the Board procedure. *E. g., NLRB v. Lizdale Knitting Mills, Inc.,* 523 F.2d 978, 980 (2d Cir. 1975); *NLRB v. Diamond Standard Fuel Corp.,* 437 F.2d 1163, 1164 (1st Cir. 1971), *reaff'd, D'Youville Manor v. NLRB, supra,* 526 F.2d at 7; *NLRB v. Automotive Textile Products,* 422 F.2d 1255, 1256 (6th Cir. 1970); *NLRB v. Vapor Blast Manufacturing Co., supra,* 287 F.2d at 407. *But see NLRB v. Schill Steel Products,* 408 F.2d 803, 804–06 (5th Cir. 1969).[9]

Although application of the rule to a particular unusual situation might result in gross injustice and call for some modification, the instant case is surely not such a situation. *See NLRB v. Vapor Blast Manufacturing Co., supra,* 287 F.2d at 407–08; *cf. D'Youville Manor v. NLRB, supra,* 526 F.2d at 7. The identity of the four witnesses, all employees, could come as no surprise since only five drivers were employed at the facility during the relevant time period. Some of their accusations had even been made known prior to trial to the company's former general manager, Mr. White. In fact, petitioner's counsel did not even re-

**8.** *Goodfriend* and *Title Guarantee* both rejected attempts to gain access to employees' pretrial statements through the Freedom of Information Act, 5 U.S.C. § 552. *Accord Harvey's Wagon Wheel, Inc. v. NLRB,* 550 F.2d 1139 (9th Cir. 1976); *Au & Son, Inc. v. NLRB,* 538 F.2d 80 (3d Cir. 1976); *Climax Molybdenum Co. v. NLRB,* 539 F.2d 63 (10th Cir. 1976).

**9.** The *Schill Steel* decision permitted pretrial discovery of statements of future witnesses, provided the usual discovery requirements of the Federal Rules of Civil Procedure, Rules

26–34, were satisfied, in civil contempt proceedings brought by the Board in federal district court. This Circuit has limited *Schill Steel* to the contempt context and refused to apply the Fifth Circuit's standard to unfair labor practice proceedings before the Board. *NLRB v. Diamond Standard Fule Corp.,* 437 F.2d at 1164. Contempt proceedings are distinguishable not only because they arise in federal court but also because the defendant's interests are more compelling.

quest a continuance; his requests for brief recesses to examine the pretrial statements before commencing his cross-examination were always granted. The mere fact that Lee was called to the stand before knowing the specific testimony of the employees did not constitute a deprivation of due process.

■ Petitioner's second procedural objection addresses the ALJ's ruling that adverse inferences must be drawn from petitioner's failure to comply with a subpoena after its motion to quash was found untimely.[10] *See United Automobile, Aerospace and Agricultural Implement Workers v. NLRB,* 148 U.S.App.D.C. 305, 459 F.2d 1329 (1972) (adverse inferences must be drawn from the seven-year, unexplained defiance of a subpoena, even though general counsel had failed to avail himself of the judicial enforcement mechanism); *cf. NLRB v. C. H. Sprague & Son Co.,* 428 F.2d 938, 942 (1st Cir. 1970) (forfeiture of right to cross-examine for failure to comply with a subpoena). However, despite his ruling, we are unable to find in the ALJ's opinion any evidence that he did in fact draw the proposed adverse inferences. Thus, assuming *arguendo* that his ruling was in error, no prejudice resulted to petitioner.[11]

All petitioner's other procedural and evidentiary objections have been considered and rejected.

The Order of the Board will be enforced.

10. The Board, upon review, subsequently held that the ALJ should have considered the general counsel's motion to exclude documents and Lee's testimony for failure to comply with the subpoena, but in light of the ALJ's ultimate conclusion, the Board also found that the error was not prejudicial.

11. Petitioner's counsel asserted in oral argument before this court that his legitimate attempts to protect his due process rights unfairly poisoned the atmosphere of the trial. Re-

view of the transcript, however, unmistakably reveals that petitioner's unnecessary conduct, often rude and insolent to witnesses, opposition counsel and to the judge himself, was primarily responsible for the unpleasant atmosphere in the courtroom. Petitioner's counsel cannot now be heard to complain of the treatment he received from the ALJ, whose only fault was perhaps too much patience rather than too little.