312 F.2d 108
 CONFECTIONERY AND TOBACCO DRIVERS AND WAREHOUSEMEN'S UNION,
LOCAL 805, IBTCWHA, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
M. ESKIN & SON, Respondent.
 Nos. 124, 125, Dockets 27496-27528.
 United States Court of Appeals Second Circuit.
 Argued nov. 15, 1962.
Decided Jan. 7, 1963.
 
 Katz & Wolchok, New York City (Charles R. Katz, New York City, of counsel), for petitioner.
 Stuart Rothman, General Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles, Robert Sewell, Attys., National Labor Relations Board, for respondent.
 Van Riper & Belmont, Newark, N.J. (Charles E. Villanueva, Newark, N.J., of counsel), for respondent Eskin.
 Before LUMBARD, Chief Judge, and SWAN and WATERMAN, Circuit Judges.
 WATERMAN, Circuit Judge.
 
 
 1
 Confectionery and Tobacco Drivers and Warehousemen's Union, Local 805, International Brotherhood of Teamsters, petitions this court to review and set aside an order of the National Labor Relations Board issued against the Union and M. Eskin & Son of East Brunswick, New Jersey. In answer to the Union's petition, the Board has requested enforcement of the order insofar as it relates to Local 805. In a separate proceeding the Board has petitioned us for enforcement of that portion of its same order which had been directed against M. Eskin & Son. The decision and order of the Board that are the subjects of these petitions are reported in 135 N.L.R.B. No. 61.
 
 
 2
 The Union transacts business from its office in New York City, within this judicial circuit. Therefore we have taken jurisdiction over the entire controversy (29 U.S.C. 160(e) and 160(f); International Ladies' Garment Workers' Union v. N.L.R.B., 96 U.S.App.D.C. 272, 225 F.2d 923 (1955); see Hicks v. N.L.R.B., 100 F.2d 804 (4 Cir. 1939), cert. denied, 308 U.S. 554, 60 S.Ct. 115, 84 L.Ed. 466), and have ordered that the separate proceedings be consolidated for purposes of briefing and oral argument.
 
 
 3
 At issue in these cases are acts of the Union and the employer in response to a 'wildcat strike' of 21 dissident Union members in 1959. Although the strike was concededly an unprotected activity, being in violation of the 'no-strike' provision of an existing labor contract, the Board contends that there was a condonation of the strikers' acts and that the employer's subsequent refusal to reinstate nine of the striking employees constituted a violation of 8(a)(3) and (8)(a)(1) of the National Labor Relations Act, 29 U.S.C. 151 et seq. The Board further found that the employer and the Union committed unfair labor practices by imposing unlawful conditions upon the reinstatement of the remaining strikrs. Both the Union and the Company were ordered to cease and desist from the allegedly unlawful acts, and to reinstate and make whole the strikers against whom the discriminations were directed. Subject to modifications to be discussed hereafter, we grant enforcement of the Board's order.
 
 The factual background is as follows:
 
 4
 M. Eskin & Son manufactures and services vending machines at its plant in East Brunswick, New Jersey. Since 1956 the Company has recognized Local 805 as the bargaining representative of its employees. The contract in force during the period here involved ran from January 1, 1959, to December 31, 1960. It contained a customary 30-day union security provision, a 'no-strike' clause, and a provision for the check-off of union dues.
 
 
 5
 In the latter part of October 1959, most of the 25 employees covered by the Local 805-Eskin contract became dissatisfied with the Local representation and determined to seek affiliation with a union other than the Teamsters. On October 24, 21 employees sent letters to both Company and Union stating that they no longer wished Local 805 to represent them, that they were revoking their dues check-off authorizations, and that they had elected one William Gerics to replace the previously-elected William Shortledge of Local 805 as their shop steward. Union business agents for Local 805 told the dissident group that they had no authority to make Gerics shop steward and threatened to 'take (Gerics) to court for doing things illegally.'The walk-out which was the source of the present dispute occurred on December 2, 1959. The Company plant manager, at the insistence of William Shortledge, had told employees Kenneth Williamson and Gene Barham that they would have to join the Union or be discharged. Inasmuch as both had been employees for more than 30 days, the demand was in accord with the Union security provision of the existing contract. Gerics and the other members of a committee which had been established by the dissident employees requested the plant manager to make an exception for Williamson and Barham so that they would not have to pay the $55 Union initiation fees and dues for the month they believed to be the final month of Local 805's representation.[1] When the Company refused to accede to the committee's request, the committee declared they would 'stick by' Williamson and Barham, and thereupon initiated the protest walkout. By the end of the day all 21 members of the dissident group had walked off the job.
 
 
 6
 The next morning, December 3, the 21 striking employees reported for work at the Company plant, but were told by the plant manager that they were fired.
 
 
 7
 It is uncontested that the Union was within its rights in demanding the discharge of Williamson and Barham and that the Company acted lawfully in respecting that demand. Although most of the employees had repudiated their affiliation with Local 805, it remained their statutory bargaining agent by virtue of the two-year contract it had with Eskin. See N.L.R.B. v. Marcus Trucking, Inc., 286 F.2d 583, 593 (2 Cir. 1961).
 
 
 8
 It is equally uncontested that the walkout violated the 'no-strike' provisions of the Local 805-Eskin contract, and thereby the strikers were deprived of the protection of the Act. N.L.R.B. v. Sands Mfg. Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682 (1939); Plasti-Line, Inc. v. N.L.R.B., 278 F.2d 482 (6 Cir. 1960); N.L.R.B. v. Draper Corp., 145 F.2d 199 (4 Cir. 1944). Indeed, insofar as the dissident employees sought by their walkout to force Eskin to repudiate the Union security provision of its contract or to negotiate directly with the dissident employees rather than with Local 805, the strike was not only unprotected, but unlawful, being in pursuit of an unlawful objective. 29 U.S.C. 158(a)(5); N.L.R.B. v. Marcus Trucking, Inc.,supra.
 
 
 9
 Without more, then, the Company was fully within its rights in discharging the striking employees or in rehiring only those discharged workers it chose to rehire. N.L.R.B. v. Fansteel Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627 (1939); N.L.R.B. v. Marshall Car Wheel & Foundry Co., 218 F.2d 409 (5 Cir. 1955); N.L.R.B. v. Draper Corp., supra.
 
 
 10
 The Board found, however, in disagreement with its Trial Examiner, that Eskin condoned the unlawful actions of the striking employees, and thereby waived its right to refuse them reinstatement save on the ground that their positions had been permanently filled. This finding was based upon the following facts:
 
 
 11
 After their discharge on December 3, the employees began picketing the Company plant. Eskin filed a civil action against the strikers in a New Jersey court to enjoin the picketing. In the course of that litigation, the attorney for the Company, Charles Villanueva, announced in open court on December 11 that a 'settlement agreement had been agreed upon by counsel and the parties who are all in court here today.' The terms of the settlement, Villanueva stated, included the cessation of picketing, the return of all strikers on the following Monday, and the withdrawal of certain unfair labor practice charges that had been filed against the Company. Following the court hearing on December 11, Eskin's plant manager approached the strikers and discussed arrangements for their return to work the following Monday. However, when, later that evening, the striking employees telephoned the plant manager to find out the time to return to work they were told that there had been a change of plans and that they should contact their lawyer. The next day Attorney Villanueva told the attorney for the striking employees that, for reasons he was not at liberty to disclose, Eskin 'could not go along with the settlement agreement and that the deal was off.'
 
 
 12
 On December 15, Villanueva told the attorney for the striking employees that Eskin would go along with the settlement arrangement only if it were not necessary for Eskin to reinstate six of the strikers who were alleged to have had excessive 'shortages.' On December 16 Eskin's plant manager told the 21 strikers to telephone him if they desired employment. When they called as directed, the six strikers who had been charged with excessive shortages, together with three others, were told that their jobs were filled. These nine men, whom the Trial Examiner referred to as the 'out' group, have been denied reinstatement by Eskin since that time.
 
 
 13
 Upon these facts we find substantial evidence to support the Board's conclusion that Eskin, through the statements of its attorney and plant manager on December 11, condoned the prior unlawful actions of the striking employees. Condonation requires a demonstrated willingness to forgive the improper aspect of concerted action, to 'wipe the slate clean.' After a condonation the employer may not rely upon prior unprotected activities of employees to deny reinstatement to, or otherwise to discriminate against, them. N.L.R.B. v. E.A. Laboratories, 188 F.2d 885 (2 Cir. 1951), cert. denied, 342 U.S. 871, 72 S.Ct. 110, 96 L.Ed. 655; Stewart Die Casting Corp. v. N.L.R.B., 114 F.2d 849 (7 Cir. 1940), cert. denied, 312 U.S. 680, 61 S.Ct. 449, 85 L.Ed. 1119; N.L.R.B. v. Aladdin Industries, 125 F.2d 377 (7 Cir. 1942), cert. denied, 316 U.S. 706, 62 S.Ct. 1310, 86 L.Ed. 1773.
 
 
 14
 Eskin attacks the Board's finding of a condonation on the grounds that, inter alia, the strikers 'never carried out their part of the purported bargain wherein they were to withdraw an unfair labor practice complaint' previously filed, and that the 'purported agreement made in open court on December 11th' was never 'reduced to a confirmed order.'[2] But the Company withdrew from the reinstatement agreement before either of these steps could be taken; and, moreover, its arguments are unpersuasive for they misconceive the nature of the condonation principle, which, reflecting a clear public interest in the prompt settlement of labor disputes, is more akin to the doctrine of waiver than to the technicalities of contract law. See E.A. Laboratories,supra.
 
 
 15
 Eskin, after withdrawing from the reinstatement agreement, never again adverted to the unprotected strike as the reason for refusing to rehire the nine members of the 'out' group. On December 12, Villanueva stated that he was 'not at liberty to tell' the reason for the Company's reversal of policy. Later, the refusal to rehire six of the nine was said to be excessive 'shortages,' apparently alleged failures to account for collections from vending machines. Finally, Eskin's plant manager claimed that the nine strikers were denied employment on December 16 'solely' because their jobs had been filled.
 
 
 16
 The Board, first having established the fact of a condonation, then properly found that Eskin's refusal to reinstate the 'out' group was a violation of 8(a) (3) and of 8(a)(1) of the Act.[3] It follows that the Board acted properly in ordering Eskin to offer reinstatement to, and to make whole, the nine members of the 'out' group.
 
 
 17
 The remaining portions of the Board's order concern the 12 members of the 'in' group of striking workers who were told on December 16 that they would be reinstated. As to these strikers, it is not contested that there was a condonation of the prior walkout. Eskin's plant manager told them, 'We made mistakes. You suys made mistakes. I don't want to hear anything about it. We'll come back to work and forget all about it.' The Board found, however, that the Company and Local 805 cooperated in imposing unlawful conditions upon the reinstatement of these strikers.
 
 
 18
 When Eskin's plant manager promised reinstatement to the 'in' group on December 16, he told them that they must first obtain clearance from Local 805. When, as directed by the plant manager, the men telephoned Local 805, they were told to attend a meeting at the Union's office in New York City the following day, December 17. All of the men in both the 'in' and the 'out' groups, with the exception of Kenneth Williamson, mentioned above, attended the meeting.
 
 
 19
 At this meeting, the fact that Eskin was to condition the reemployment of these strikers upon clearance from Local 805 was made known to the Local's officials. The Union representatives then brought out prepared statements and told the members of the 'in' group that they would have to sign them in order to obtain the required union clearance. The initiation of arbitration proceedings for the discharge of the 'out' group was also conditioned upon their signing the statement, which provided as follows:
 
 
 20
 'Local 805, I.B. of T. was and is my Bargaining Agent. It has always properly handled for me all disputes and grievances. I do hereby, reaffirm, ratify and adopt the Union Contract between Local 805, I.B. of T. and M. Eskin & Son, Inc., which contract is dated January 5th, 1959 and which does not expire until December 31st, 1960.
 
 
 21
 'I hereby revoke and declare null and void any bargaining representation I have signed for Local Union No. 22, United Metal and Paint Workers and Allied Trades, or any other Union except Local 805, I.B. of T.
 
 
 22
 'I hereby revoke and declare null and void any revocation or withdrawal of our check-off authorization and I reaffirm and re-institute my check-off authorization.
 
 
 23
 'I further request the withdrawal of any petition for an election filed by Local Union No. 22, United Metal and Paint Workers and Allied Trades, and the withdrawal of any charges of unfair labor practices.
 
 
 24
 'I agree to hold harmless Local 805, I.B. of T. from any claim of damages whatsoever which we may have and we release Local 805 I.B. of T. from any claims whatsoever.'
 
 
 25
 Thereafter eight members of the 'in' group returned to work, six of whom had signed the Union statement. Williamson, whose refusal to join the Union had been the original cause of the walkout, and who did not attend the meeting in New York City, did not return to work. Three other members of the 'in' group refused to sign the Union statement and were not reemployed. The situation thus created is discussed later.
 
 
 26
 On the basis of the above facts the Board found the Union to be in violation of 8(b)(1)(A) and 8(b)(2) of the Act for requiring the strikers, as a condition of union 'clearance' for reinstatement, to submit to the conditions contained in the Union's statement. We agree. Subject to the obligation to pay periodic dues and fees pursuant to the union security provision of the existing contract, the strikers were within their rights in repudiating their affiliation with Local 805, in withdrawing their check-off authorizations, in seeking representation from another union, and in bringing charges before the Board. To condition union clearance for reemployment upon the abandonment of these rights was clearly in violation of 8(b)(2) and 8(b)(1)(A) of the Act.[4] Radio Officers' Union v. N.L.R.B.,347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954); N.L.R.B. v. Broderick Wood Products Co., 261 F.2d 548 (10 Cir. 1958); N.L.R.B. v. Syracuse Stamping Co., 208 F.2d 77 (2 Cir. 1953).
 
 
 27
 We find no sufficient evidence in the record, however, to justify the Board's finding that Eskin cooperated with Local 805 in the Union's scheme to impose these unlawful conditions upon the reinstatement of the striking employees. Although it is not claimed that the Company knew the precise contents of the Union's statement, the Board rested its finding of cooperative involvement upon the following incident:
 
 
 28
 At the December 16 meeting when the 12 members of the 'in' group were told they would be reemployed, Eskin's plant manager told them that they would first have to get 'in good standing with the union, does paid and everything else.' When one of the strikers doubted that anyone would be in the Union ofice that late in the evening, the plant manager assured him that 'there would be some one at 805, so make the phone.' To conclude from these facts that Eskin acquiesced or cooperated in the subsequent Union attempt to put an end to the strikers' rival union activity is, in our view, unjustifiable speculation on the part of the Board.
 
 
 29
 Eskin was entitled to demand Union clearance of the strikers if that clearance turned upon the payment of all past dues. 29 U.S.C. 158(a)(3). The Company had some reason to believe that the strikers might be in arrears on their dues payments, for nearly two months earlier the same employees had revoked their dues check-off authorizations. Moreover, they had been off the Company payroll for two weeks prior to the promise of reinstatement.
 
 
 30
 On the record before us, therefore, we must deny enforcement of that portion of the Board's order which rested upon a finding of Eskin's complicity in the Union plan to stamp out rival Union activity.
 
 
 31
 We turn, finally, to the portion of the Board's order requiring Eskin to offer reinstatement to, and requiring both Eskin and Local 805 to make whole, those members of the 'in' group who (1) failed to sign the required statement and (2) were not reemployed by the Company.
 
 
 32
 The first of these discharged employees was Williamson, whose initial refusal to join the Union was the source of the December 2 walkout. Williamson's discharge, of course, was not based upon the same grounds as that of those employees who struck out of sympathy with his cause. Under the Union security provision of the existing contract, Eskin was bound not to reinstate Williamson until he settled the disputes with Local 805 over his initiation fee and unpaid dues. After the time that Williamson was so informed he never again contacted either the Union or his former employer. Williamson did not attend the Union meeting in New York City and there is no evidence that he even knew of the conditions which Local 805 sought to impose upon the strikers' reinstatement.
 
 
 33
 Upon these facts, it is clear, we believe, that the order of the Board must be modified insofar as it requires the reinstatement of, or the payment of compensation to, Williamson.
 
 
 34
 Three remaining strikers, Balajathy, Kupic, and Smith, were members of the 'in' group, and were promised reinstatement on December 16. They attended the Union meeting in New York City on December 17 and did not sign the required statement there presented. They have not been reemployed by Eskin since that time. The Board ordered that they be paid by the Company and Local 805 sums equal to their lost wages and that they be offered reinstatement to their former positions.
 
 
 35
 After being directed by Eskin to seek Union clearance, these employees never again contacted the Company or informed its officers of the unlawful conditions being imposed upon the obtaining of that required clearance. Inasmuch as we have found no evidence of Eskin's complicity in the imposition of these conditions, Eskin cannot be required to share the burden of the payment of the lost compensation the Board has ordered be paid, and therefore the order of the Board must be modified accordingly.
 
 
 36
 Local 805 also denies any responsibility for the failure of Balajathy, Kupic, and Smith to be reinstated in their former positions of employment. Although the three men did not sign the union statement on December 17, their position at the meeting that day was, 'either we all go back to work or nobody goes back.' They did not report to work the morning of December 18. Later that day, however, they sent a telegram to Local 805's business agent stating that they were ready and willing to go back to work and asked the business agent to 'come down to see us.' That same day the business agent responded by letter and informed them that their reemployment was 'a matter within the sole discretion of M. Eskin & Sons' and that 'the Union is not standing in the way of the Company putting you back to work.' The three men made no subsequent effort to contact either the Union or the Company.
 
 
 37
 Upon these facts there was sufficient evidence to justify the Board's finding that Balajathy, Kupic, and Smith failed to return to work on the morning of December 18 because of the unlawful conditions placed upon their clearance by the Union. Other motivations may well have been at work, including a feeling of solidarity on the part of these members of the dissident employees' committee with those strikers who had not been offered reinstatement; but where one adequate ground for the failure to return to work has been established, we are not called upon to speculate whether these strikers would have maintained their 'all or none' demand had that ground not existed.
 
 
 38
 The Board left to the compliance stage of the proceedings the decision whether Local 805 sufficiently purged itself of responsibility for these strikers' failure to be reemployed by its letter of December 18. That issue is not before us, therefore, on these petitions.
 
 
 39
 The order of the Board is enforced subject to the modifications stated herein.
 
 
 40
 LUMBARD, Chief Judge (concurring and dissenting).
 
 
 41
 I concur in the majority's opinion except insofar as it reverses the Board's finding that Eskin, the employer, cooperated with the Union in its attempt to impose unlawful conditions on the reinstatement of the striking employees, and that it thereby violated 8(a)(1-4) of the NLRA, 29 U.S.C. 158(a) (1-4). I would sustain this finding, and therefore would grant enforcement of the Board's order in its entirety, except with respect to employee Williamson, who, as Judge Waterman points out, was discharged because he failed to comply with the lawful requirement that he pay union dues and who never thereafter paid or offered to pay them.
 
 
 42
 The portion of this case about which my brothers and I disagree concerns the three members of the 'in' group who, together with Williamson, were told by Jacobs, the plant manager, that they could have their jobs back but who were subsequently not rehired. In my judgment there is substantial evidence in the whole recored, see Universal Camera Corp. v. N.L.R.B., 340 474, 71 S.Ct. 456, 95 L.Ed. 930 (1951), to support the Board's finding that Eskin acquiesced in and assisted the Union's effort to impose unlawful conditions on the reinstatement of these employees, which conditions, as my brothers agree, were at least one explanation of their failure to return to work.
 
 The consisitent testimony of the members
 
 43
 The consistent testimony of the members contacted Jacobs on December 16, he told them that they could have their jobs back if they first obtained 'clearance' from the Union. Smith testified that he was told that he 'would have to be cleared with Local 805' and was given the Union's telephone number. Kupic testified that Jacobs gave him a telephone number and told him to 'call it and get clearance from the union.' Balajathy testified that Jacobs saw him and Sokoloff together and said to them, 'Before you come back to work, you have got to get clearance from Local 805.' Jacobs offered to provide the telephone number and said that despite the lateness of the hour someone would be at the Union offices. Sokoloff testified that Jacobs told him that he 'should check with the union' to see whether he was 'still a member in full standing.' Williamson testified that Jacobs 'said something about going to the Union, Local 805, and straightening it out with them or something like that.' Jacobs' own testimony was that he instructed the employees 'to contact their union to see if their dues were paid and they were in good standing with their union, because we still were under contract with Local 805.' The trial examiner credited the testimony of the employees, which was not contradicted by Jacobs except as to the precise words used and his recollection of a specific reference to the payment of dues.
 
 
 44
 On this record, I cannot agree with my brothers that the Board's conclusion that the employer participated in the Union's imposition of unlawful conditions on reinstatement is 'unjustifiable speculation.' The majority states that Eskin could insist upon Union clearance 'if that clearance turned upon the payment of all past dues.' But it is only the majority's speculation, unsupported by he record, that this is what Jacobs had in mind when he spoke to the employees. According to the employees' testimony, Jacobs never referred specifically to the payment of dues; even by his own testimony, Jacobs' remarks were not confined to the question of dues. Jacobs knew that the employees were dissatisfied with the Union and that their disagreement with it had progressed so far that they were seeking to obtain new representation. In such a situation, it was surely within the bounds of permissible inference for the Board to conclude that Jacobs' references to Union 'clearance' and 'good standing' in the Union pertained to more than the payment of dues. Even if, as the majority suggests, the employer had 'some reason' to believe that dues might be unpaid, this scarcely explains the blanket requirement of a general Union clearance imposed on all employees.
 
 
 45
 It is, of course, not material that the employer may not have known the precise nature of the conditions which were imposed. The imposition of any conditions beyond the payment of Union dues and fees was unlawful. Radio Officers' Union of the Commercial Telegraphers Union, AFL v. N.L.R.B., 347 U.S. 17, 40, 74 S.Ct. 323, 335, 98 L.Ed. 455 (1954); N.L.R.B. v. Bell Aircraft Corp., 206 F.2d 235, 238 (2 Cir. 1953). Nor do subsequent acts, such as the rehiring of several employees who did not sign the Union's prepared statement, avoid the effect of the employer's participation in the Union's scheme.
 
 
 46
 I would grant enforcement of the portions of the Board's order based on the finding that the employer violated 8(a)(1-4) of the NLRA.
 
 
 
 [1]
 The committee was under the mistaken impression that the Company's agreement with Local 805 expired on December 31, 1959, rather than 1960
 
 
 [2]
 The Company also maintains that because of the illegality, as distinguished from the merely unprotected character, of the wildcat strike in this case, the doctrine of condonation has no application. Although some union activities may be so offensive to the policies of the Act as to withdraw from the wrongdoers the protections of the Act in perpetuity, see Mackay Radio & Telegraph Co., Inc., 96 N.L.R.B. 740, the Board determined that the actions of the strikers in this case did not demand such an extreme sanction. We agree
 
 
 [3]
 We agree with the Board that Eskin failed to sustain its burden of proof that these prior employees had been permanently replaced on December 16
 
 
 [4]
 We agree that the Union was equally in violation of the Act by placing unlawful conditions on the arbitration of the Company's refusal to reinstate the 'out' group. Although the initiation of arbitration proceedings was, by terms of the contract, to be determined by the Union alone, the Union had a duty fairly to represent all the employees in the unit, whether or not they were interested in a rival union. Steele v. Louisville & Nashville R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944); Hughes Tool Co. v. N.L.R.B., 147 F.2d 69 (5 Cir. 1945)