NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

CUMBERLAND FARMS DAIRY,
INC., Respondent.

No. 81–1178.

United States Court of Appeals,
First Circuit.

Argued Oct. 6, 1981.

Decided March 8, 1982.

Susan L. Dolin, Atty., Washington, D. C.,
with whom William A. Lubbers, Gen. Coun-

sel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Andrew F. Tranovich, Washington, D. C., Atty., were on brief, for petitioner.

Harold N. Mack, Boston, Mass., with whom Morgan, Brown, Kearns & Joy, Boston, Mass., was on brief, for respondent.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, and WYZANSKI,* Senior District Judge.

LEVIN H. CAMPBELL, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order directing Cumberland Farms Dairy, Inc. ("the Company") to reinstate with back pay five employees, William Roy, Noel Roy, Robert Fluette, Marcel Dulac and Michael Freeman, all of whom the Board found to have been discharged in violation of sections 8(a)(1) and (3)[1] of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (3). We begin with a review of the facts which were, unless otherwise noted, supportably found by the administrative law judge (ALJ) and adopted by the Board.

Cumberland Farms Dairy, Inc. is a Massachusetts corporation which owns, operates, and supplies an extensive system of convenience grocery stores throughout the northeastern United States and Florida. The events at issue took place at or near the Company's Westboro, Massachusetts warehouse, which serves as a regional supply center for Cumberland's retail stores. Four of the employees involved—William and Noel Roy, Fluette and Dulac—were delivery truck drivers for the bakery division based at the Westboro facility. One, Robert Freeman, was a Westboro warehouse worker.

In December 1977, a disaffected former supervisor at the warehouse, Curtis Rand, contacted William Roy and asked him to help start a union among the truck drivers. William agreed and spoke of the idea to two other bakery drivers, Noel Roy (his brother) and Robert Fluette. A meeting was arranged by Curtis Rand to be held on December 16, 1977, at the nearby Cowshed Lounge, a local bar frequented by Cumberland employees and supervisors.

The meeting was a disappointment. Only five out of 22 or 23 delivery truck drivers in the bakery division showed up to sign union authorization cards—William and Noel Roy, Robert Fluette, Marcel Dulac, and Richard Lombardo. These men, seeing Cumberland supervisors in the bar, never entered the lounge. Instead, they signalled to Curtis Rand, who was also in the bar, from the doorway. Rand sent his wife outside with some authorization cards; the employees signed their cards in a nearby parking lot and quickly departed.[2] After this, Curtis Rand apparently lost interest and was heard from no more. None of the drivers who signed cards the night of December 16 pursued their initial organizing attempt.

In the next several months the Company sent mixed signals with respect to the employees who signed cards. On the one

---

* Of the District of Massachusetts, sitting by designation.

1. Section 8(a), 29 U.S.C. § 158(a), provides,
    (a) It shall be an unfair labor practice for an employer—
        (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7.
        *    *    *    *    *    *
        (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.
    Section 7, 29 U.S.C. § 157, provides,
        Employees shall have the right to self-organization, to form, join, or assist labor or-

ganizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . .

2. The ALJ supportably found that Rand had "made no secret" of his purpose in being at the Cowshed that night. Thus, from the presence at the bar of Company supervisors and Rand's attempts to encourage some other drivers in the bar to sign cards, as well as other evidence, the ALJ reasonably inferred that the Company knew as of this meeting that union activity was afoot.

hand, William Roy, Noel Roy, Robert Fluette, and Marcel Dulac testified, and the ALJ found, that they were individually approached after the meeting by their supervisor, Wayne Thornhill, who told each of them in various ways that, while he could not fire them for joining a union, he could make it "rough" for them.[3] On the other hand, the ALJ found no evidence that these four men were, in fact, treated differently from anyone else at the warehouse during the following months. Indeed, the ALJ specifically and supportably found no evidence of "either individual discrimination [against the four employees] nor a pattern or practice of such in the period from December 16, 1977 to February 2, 1978."

On February 2, 1978, an incident occurred which resulted in the termination of both Roys and Robert Fluette. At about 5:30 a. m. William Roy arrived for work and began helping to load his own truck. Seeing that he had an unusually heavy load, he left the loading dock and sought out supervisor William Haley—overseer of the bakery operation—to see if Haley would authorize a helper to assist him on his route. Haley told Roy he could have a helper "if one was available." Roy returned to the dock and told supervisor Thornhill that Haley had authorized a helper for him. Thornhill checked with Haley by phone, got the full extent of Haley's order—including the qualification of "availability"—and returned to the loading dock. William Roy then renewed his request, and Thornhill told him there were not any helpers available. When William persisted, stating that the load was too big for one person, Thornhill told him that he could punch out and "go home" if he did not like the situation.

Noel Roy then joined his brother and began to argue on William's behalf. Thornhill testified that he then turned to Noel, pointed to him with his finger (touching him on the chest as he did so), and told Noel to mind his own business. Other witnesses contradicted Thornhill, stating that he gave

Noel a hard backhand blow to the chest as he turned to him. In any event, Noel's response, according to the ALJ, was "swift and savage." Noel testified that he immediately "hit [Thornhill] with my right hand," connecting with him "in the mouth." A five-minute brawl broke out between the two men which left Thornhill bruised and missing a portion of scalp. When the other men on the dock succeeded in separating the two, Thornhill fired Noel. However, Noel did not leave immediately but stood around on the platform uttering threats. Thornhill called the guard shack and requested that the police be summoned. Noel then left the loading dock, followed quickly by his brother William who, the ALJ found, quit in sympathy with his brother.

Meanwhile, William Haley and Ronald Choquette, supervisor of the security section, were on their way to the dock, having received word of the fight. On their way across the warehouse yard they met the departing Roys. According to Haley, whom the ALJ credited most on this incident, Noel asked Haley if he wanted "some of the same that he had just given Wayne." After some threatening gestures on both sides, Choquette—who said that he would call the police—escorted the Roys from the warehouse.

Back at the loading dock, Robert Fluette and Marcel Dulac decided to see if they could speak with John Peck, the overall director of warehouse operations, about the incident. In their view, Noel's discharge was unfair because Thornhill had "started it." They pulled their loaded trucks to one side of the warehouse lot and went into the warehouse to see Peck. Instead, they encountered Thornhill.

Thornhill asked the men why they were not on their routes. Fluette countered with a request to see Peck. Thornhill then stated, "You have ten minutes to get off the premises." Fluette interpreted this as a discharge, slapped his delivery papers on a

---

3. Being made more than six months before the employees complained to the Board, his statements could not be adjudged unfair labor practices. 29 U.S.C. § 160(b). Employee Lombardo, the other card signer, did not testify at the hearing, but the ALJ noted that he was elevated to a supervisory position with Cumberland sometime after the events of this case.

nearby table and left the warehouse. Dulac was less hasty and stated, as he turned to follow Fluette, "nobody has quit or got fired." Before he could catch up to Fluette, however, he met Haley and Choquette coming from their encounter with the Roys. Haley and Choquette asked Dulac what was going on. Dulac replied that he and the other drivers were unhappy about overloaded trucks. When asked about the fight and the Roys, however, Dulac said he knew nothing about it. Dulac then proceeded to his truck and went out on his route.

About an hour later, Fluette met the two Roys at a nearby diner, and the three decided to call Peck to attempt to get their jobs back. They made the call and set up an appointment to see Peck that same day. At around noon, William Roy and Fluette [4] met with Peck as scheduled. According to the employees' testimony, they received full reinstatement for all three men in the course of a 90-minute meeting. Peck contradicted this account, testifying that he had told the men that they could have their jobs "so far as I was concerned" but that supervisors Haley and Thornhill would have to approve any final reinstatement. The ALJ credited the employees' version of this meeting and found that the three men were fully reinstated.

Nevertheless, Peck changed his mind sometime during the next 24 hours after meeting with his supervisors. The evidence in the record shows that Peck met with Choquette later on February 2 and talked with Haley either that afternoon or the next morning. After these conversations, Peck decided that the terminations would stand. When the Roys and Fluette returned to work on the morning of February 3, they were turned away. Cumberland has not employed them since then.

Marcel Dulac, who escaped the debacle of February 2 by electing to take his truck out as ordered, was discharged some two weeks later in an unrelated incident. According to Dulac's testimony, he was fired by Cumberland for improperly borrowing money from retail outlets and for falsifying meal receipts during the Great Blizzard of 1978 while his truck was stranded by snow in Rhode Island. The Company disputed this, claiming that Dulac voluntarily quit after being accused of these offenses. The ALJ found that Dulac was in fact discharged, not for any reasons asserted by the Company, but for having expressed interest in a union and for having signed a union authorization card.

The final termination in this case involved one Michael Freeman, an order picker in the health and beauty section of the Westboro warehouse. As the ALJ aptly put it, Freeman's case, while involving the same employer, took place under "totally unconnected circumstances." Freeman was hired in December 1977. Toward the end of February 1978, Freeman became annoyed at the Company when he and other employees were not paid for the Washington's Birthday holiday. He spoke with others in the section about forming a union and, unaware of the earlier organizing activity among the truck drivers, he contacted a union local in Worcester, Massachusetts. Apparently with the union's encouragement, Freeman scheduled a union organizing meeting for March 8, 1978, at the Westboro Veterans of Foreign Wars meeting hall.

This meeting never took place. Freeman cancelled it on March 5 or 6 because of information he received from another employee.[5] On the day of the scheduled meeting, however, Freeman was approached by his supervisor, James Taylor, while Freeman was talking to several other employees. Taylor drew Freeman aside and told him he was laid off immediately because the Company did not have enough work. Freeman then punched out.

Some weeks later Freeman filed the complaint which is now at issue in this case. In response, the Company made an investiga-

4. Noel Roy waited at the warehouse guard shack.

5. The alleged reason for the cancellation was ruled to be hearsay by the ALJ and is not part of the record on appeal.

tion of its files on Freeman to prepare its defense. In the course of this investigation, supervisor Choquette approached Cumberland's office manager, Linda Catino, and, according to her testimony, "Ronnie Choquette told me that I was to pull Michael Freeman's file and I was not to say anything to anyone about it." When Catino asked Choquette why he wanted the file, Choquette replied that "Michael Freeman had been trying to form a union in the warehouse and they had fired him. And that Michael Freeman had filed suit against the Company and now Cumberland Farms had to try to substantiate their claim as to why they fired him."[6] Choquette denied that this conversation took place, and Cumberland's attorney, who was found by the ALJ to have been only a few feet from Catino and Choquette when this exchange took place, had no recollection of the conversation.[7] The ALJ nevertheless fully credited Linda Catino's account.

Based upon the above and other findings, the ALJ and subsequently the Board found that all five of these employees were terminated in violation of sections 8(a)(1) and (3) of the National Labor Relations Act. The Board thereupon ordered reinstatement of the employees to their former or equivalent jobs, with back pay.

Our review of the Board's order is guided by section 10(e) of the Act, which provides that the Board's findings are conclusive if supported by substantial evidence on the record as a whole. 29 U.S.C. § 160(e). Substantial evidence " 'is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion ...,' " *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951), *quoting Consolidated Edison Co. v. NLRB*,

305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). In reviewing under a substantial evidence standard, we take into account all the evidence relied upon by the Board including "whatever in the record fairly detracts from its weight." 340 U.S. at 488, 71 S.Ct. at 464.

The standards to be applied in discriminatory discharge cases under section 8(a)(3) have been most recently stated by this circuit in *NLRB v. Wright Line*, 662 F.2d 899 (1st Cir. 1981). In such cases, the employer commonly has two possible defenses. First, he may win if it is shown that the discharge was without any anti-union animus at all. *Liberty Mutual Insurance Co. v. NLRB*, 592 F.2d 595, 603 (1st Cir. 1979). Second, if such animus existed, he may still prevail if the discharge would nonetheless have occurred, there being a valid independent business reason for termination which would have produced the discharge in any event. *NLRB v. Eastern Smelting & Refining Corp.*, 598 F.2d 666, 671 (1st Cir. 1979). With these principles in mind, we turn to the terminations at issue in this case.

*Noel Roy, William Roy and Robert Fluette*

The Roy brothers and Robert Fluette were terminated in connection with Noel Roy's fight with Wayne Thornhill on February 2. The ALJ found, with adequate record support, that Noel Roy and Robert Fluette were discharged as a direct result of the fight and that William Roy quit to protest his brother's discharge. Anti-union animus, according to the ALJ, played no role in any of these terminations.

The ALJ went on to find, however, that director Peck fully reinstated these

---

**6.** On cross-examination, Catino recharacterized Choquette's statement as being that "Michael Freeman was fired *for* trying to start a union." (Emphasis added.)

**7.** Philip Moss tried this case for Cumberland before the ALJ and also appeared as a witness after Catino testified that Moss was in a nearby area on the day Choquette asked Catino for Freeman's records. Cumberland argued to the Board and renews the point on appeal that it

was denied due process of law because the General Counsel unfairly and unnecessarily drew Moss's name into the proceeding and forced Moss to be a witness, all of which biased the ALJ against both the Company and Company's counsel. We find no merit in this contention; in particular we find no indication that the ALJ was biased. We accordingly reject the Company's due process claim.

employees at his noon meeting with them [8] and then terminated them again, this time for anti-union reasons, sometime on the afternoon of February 2 after talking to supervisor Choquette. We conclude that this finding of a discriminatory motive for the post-reinstatement round of terminations is unsupported by substantial evidence, and accordingly we do not enforce the Board's order respecting employees Noel Roy, William Roy and Robert Fluette.

Peck testified without contradiction that he had not spoken with any supervisors about the fight prior to his noon meeting with the employees. While the ALJ found that Peck "knew" the fight had taken place by noon, he made no finding that Peck had discussed it with his supervisory staff by then. Rather, the evidence showed that Peck met with Choquette for the first time on the afternoon of February 2 and that he spoke with Haley either that day or the next morning. The evidence also demonstrated, and the ALJ found, that both Choquette and Haley had been physically and verbally threatened by the Roy brothers on February 2 as the Roys were leaving the warehouse. Choquette and Haley testified that because of the fight and these threats they recommended to Peck that the employees not be taken back on account of their violent behavior. As Haley put it, "I told [Peck] . . . that because of the fight, the threat and abusive language that I had got on the way out that I wouldn't consider [reinstatement]." Peck corroborated this testimony, as did office manager Linda Catino, who spoke to Peck about the employees' status the day after the fight.[9]

The General Counsel contended to the ALJ that Thornhill had provoked the fight as a pretext to discharge the three for anti-union reasons, a theory which the ALJ supportably *rejected*. Assuming the correctness of the ALJ's finding in this regard, we find puzzling his further finding that Peck's change of heart regarding reinstatement was motivated by anti-union animus.[10]

The ALJ mentioned three events as leading him to infer anti-union motivation in the revocation of Peck's reinstatement: Thornhill's threats to Dulac, Fluette and the Roys after the Cowshed meeting, Thornhill's back dating of certain disciplinary forms respecting these employees after their terminations,[11] and Choquette's statement to Linda Catino in the Freeman case that Freeman's discharge was motivated by union activity. These three very general pieces of evidence, however, shed little light upon Peck's change of heart in this specific situation where the initial firings were concededly proper. Thornhill's threats occurred over a month prior to the fight and came, the ALJ found, to nothing

---

8. The evidence on whether this reinstatement actually occurred was conflicting. Peck testified that he had reinstated the men conditional upon approval of their supervisors. The employees testified that reinstatement was unqualified. While Peck's version might seem the more reasonable given the fact that Peck had yet to hear the supervisors' side of the story, we normally uphold the Board's credibility determination in matters such as this and, for purposes of our decision, do so here. *P. S. C. Resources, Inc. v. NLRB*, 576 F.2d 380, 382 (1st Cir. 1978).

9. Catino testified that she called Peck to see why the men were denied admittance to the warehouse the day after the fight. According to her testimony, which the ALJ otherwise credited very highly, Peck replied that "he had told them that they could return if they wanted to, but that after he had said that, his supervisors objected to it and he said he would not overrule them."

10. If the trio's participation in the Cowshed meeting in December 1977 had so upset the Company that it was seeking a pretext to fire them, it is surprising that Peck, its chief manager at the warehouse, would have reinstated them on February 2. Peck, indeed, was himself at the Cowshed on the night of the "meeting," although he left before it got under way.

11. There was evidence that Thornhill did not make reports of the fight incident for the Roys' and Fluette's disciplinary files until sometime after the actual event. He nonetheless asked Linda Catino, who typed the reports, to back date them to some earlier day. There was also evidence that a disciplinary report on William Roy respecting a damaged truck had been fabricated sometime after Roy was fired. The ALJ, pointing to all of this evidence, found that the Company's records were less than reliable and generally discredited both the records and testimony which was based on them.

in terms of concrete action. Indeed, the ALJ exonerated Thornhill from anti-union motives in firing the employees after the fight; certainly Thornhill had reasons enough of his own after the beating for not wanting to rehire the men. That Thornhill's disciplinary reports of these and some other incidents were back dated after the terminations adds very little. Such back datings might have raised legitimate suspicions if there were some doubt about whether or when the fight took place, but there is no such doubt here. The date and substantially all of the facts regarding the fight were admitted by both sides. Similarly, Choquette's statement about Freeman's discharge, made in March or April, while relevant to the question of the Company's general anti-union bias, is scarcely probative on what motivated Peck to change his mind about the Roys and Fluette on February 2.

The ALJ suggests that since Choquette made an anti-union statement in April, it is likely that he made one in February when consulted by Peck after the fight. This is entirely conjectural, however. No evidence supports it, while there is much direct testimony and circumstantial evidence that Choquette and Haley focused upon the fight and the threats when Peck spoke with them

concerning the employees' reinstatement. Thus, *all* of the direct evidence regarding the events of February 2 points toward perfectly legitimate motives, sufficient in themselves, to support the terminations of the Roys and Fluette,[12] *NLRB v. Eastern Smelting & Refining Corp.*, 598 F.2d at 671; *American Manufacturing Association v. NLRB*, 594 F.2d 30, 36 (4th Cir. 1979), while the evidence pointed to by the ALJ is all remote, general and unrelated to the specific issue. Looking at the Board's evidence in the light of facts which "fairly detracts from its weight," *Universal Camera v. NLRB*, 340 U.S. at 488, 71 S.Ct. at 464, we are forced to conclude that the record is without substantial evidence to support the Board's finding that these terminations were caused by anti-union sentiment. In other words, given the *legitimate* hostility of Thornhill's co-supervisors toward these employees, the General Counsel cannot be said to have carried his burden of showing that they would have been treated any differently but for their union involvement. We therefore decline to enforce the Board's order of reinstatement for employees William Roy, Noel Roy and Robert Fluette.[13]

*Marcel Dulac*

█ The ALJ found that Marcel Dulac was illegally discharged about two weeks

---

12. Noel Roy, of course, was the main participant in the fight and so was the subject of a legitimate discharge on the basis of his violent acts. William Roy quit, leaving his route unattended, and participated with his brother Noel in threatening supervisors Choquette and Haley. These acts would seem to constitute sufficient grounds for termination. Fluette, perhaps the most innocent victim of the fracas, was discharged for not going immediately on his route after the fight. While we might question the fairness of Fluette's discharge as an abstract matter, we note that the National Labor Relations Act leaves an employer free to deal with his employees as he sees fit so long as anti-union animus plays no role in his decision to discharge. *Liberty Mutual Insurance Co. v. NLRB*, 592 F.2d 595, 603 (1st Cir. 1979). Here, the ALJ specifically and supportably found that Thornhill's discharge of Fluette was in no way affected by illegal motivations. Nor was there sufficient evidence that Peck was so motivated when he decided to revoke Fluette's reinstatement. In such circumstances, we are constrained by the Act to honor the employer's decision.

13. The ALJ and subsequently the Board apparently relied in part upon the theory of "condonation" to hold that, once Peck had reinstated the employees, he waived any right to revoke those reinstatements for unprotected actions of which he was aware when he granted the reinstatement request. *See Confectionery & Tobacco Drivers and Warehousemen's Union v. NLRB*, 312 F.2d 108 (2d Cir. 1963). However, the condonation doctrine is normally applied in the context of rehiring striking workers who may have engaged in unprotected activity while on strike. The doctrine seeks to further the policy of enforcing the terms of negotiated settlements to organized labor disputes. Here, the circumstances are markedly different from the situation facing employees after a strike. The fight in this case bore no relation to any activity protected under section 7 of the NLRA. In addition, the employees' reinstatement was given without any prior discussion of the incident with the supervisors who were directly involved. Nor did a great amount of time pass between the reinstatement, the subsequent discussions with supervisors, and the terminations. The entire process took less than 24

after the Thornhill-Roy incident on the pretext of his having falsified meal receipts and borrowed money improperly from retail stores while his truck was stranded in Rhode Island during the Great Blizzard of 1978. Dulac claimed, and the ALJ reasonably credited his testimony, that his meal receipts were accurate and that he had received emergency authorization to borrow the money he needed to sustain himself during the storm. The Company produced no direct evidence, such as the meal receipts themselves, to contradict Dulac's story, and there was some corroboration, at least with respect to the authorization question, to bolster Dulac's version of events. There was also evidence that Dulac had carried an illegal passenger on his truck, though the circumstances surrounding this activity strongly suggest, and the ALJ found, that Dulac had been given at least tacit authority to carry his passenger as a way of training him to take on a route.[14]

Cumberland defended itself on this charge, however, not by asserting that the discharge was justified, but by claiming that Dulac was not fired at all but voluntarily quit. In support of its position, the Company relied upon the testimony of Haley and Choquette, who were present at a disciplinary meeting when Dulac was accused of the various charges at issue here. These men testified that Dulac was offended at being so accused and quit as a result of the meeting.

While the evidence upon whether Dulac quit or was discharged was mixed, we find that there was substantial evidence to support the ALJ's finding that a discharge took place. Dulac himself claimed he was discharged and gave a vivid, believable account of the meeting where he was told he was fired. Moreover, the Company admitted in both its answers to the complaints in this case and in its correspondence with the Massachusetts Division of Employment Security on Dulac's post-termination application for unemployment compensation that Dulac was "discharged." Cumberland has pointed to little beyond the testimony of its own witnesses to indicate that the ALJ was unreasonable in crediting Dulac's testimony over Choquette's and Haley's.[15] We accordingly uphold the ALJ's supported finding that a discharge took place—a discharge which was not justified by any improper actions on Dulac's part during the Great Blizzard of 1978.

Thus, in Dulac's case, unlike the situation respecting Fluette and the Roys, there is probative evidence which specifically rebuts the Company's alleged defenses regarding both the discharge and Cumberland's reasons for being dissatisfied with Dulac's performance as an employee. The General Counsel also showed that Dulac had signed a union authorization card and had been specifically warned by Thornhill to give up his affiliation with the union. From all this, we think that the ALJ and Board were justified in inferring that Dulac was not terminated for the reasons given by the Company, but because he engaged in protected activity. Accordingly, we enforce the Board's order respecting employee Dulac.

hours. To hold that an employer has no right to change his mind in circumstances such as these would be to seriously interfere with his right to govern his own business, an aspect of which is his prerogative to fire employees "for cause." 29 U.S.C. § 160(c). Regardless of what Peck told the employees at noon on February 2, he was entitled to change his mind after talking to supervisors who were threatened by these same men earlier in the day. *Cf. Florida Steel Corp. v. NLRB*, 529 F.2d 1225, 1233–34 (5th Cir. 1976) (upholding discharge where employee cursed and threatened supervisor). Both the ALJ and the board erred in believing that the condonation doctrine was applicable here.

14. Dulac's passenger was in fact later hired by the Company as a driver, in part because of his prior experience.

15. The Company refers to "numerous major inconsistencies" in Dulac's testimony, some of which related to Dulac's sworn affidavit taken a few days before the hearing. We have examined the record in detail and find that Dulac was both consistent and detailed in recounting the essential matter at issue here—*i.e.*, what occurred at the meeting when he was discharged. We therefore find the ALJ's decision to credit Dulac on this issue well within reason. *NLRB v. Pearl Bookbinding Corp.*, 517 F.2d 1108, 1112 (1st Cir. 1975).

### Michael Freeman

■ Finally, with respect to Michael Freeman, we conclude that the Board's finding of an illegally motivated termination [16] is supported by substantial evidence. It was uncontradicted that Freeman engaged in organizing activities just prior to his termination on March 8. Indeed, he had scheduled a union meeting for the very day he was terminated. Moreover, the ALJ found that supervisor Choquette commented to office manager Linda Catino that "Freeman had been trying to form a union ... and they fired him." In her testimony, Catino also characterized Choquette's statement as being that "Michael Freeman was fired for trying to start a union." While Catino's testimony was denied by Choquette, the ALJ reasonably credited her responses as "open, logical and consistent" in contrast to Choquette's, which he found to be less trustworthy. Such credibility judgments are for the ALJ to make, and we see no reason to disturb these. [17]

In rebuttal, the Company claimed that Freeman was not laid off at all but rather was discharged for excessive lateness. They buttressed this defense with records showing that Freeman had the worst lateness record in his department and that in the past other employees had been fired for similar records, though there was also evidence that at least one other employee in Freeman's unit had a comparable tardiness record and was not terminated. Freeman himself testified that he was habitually late, sometimes by as much as half an hour, every week he worked for Cumberland Farms. Choquette testified that he had personally warned Freeman about the tardiness problem, though Freeman denied having received such a warning. Both Choquette and Freeman agreed, however, that Freeman's immediate supervisor, James Taylor, had warned Freeman regarding tardiness. Choquette went on to state that Freeman was finally fired as part of a general trimming of the payroll occasioned by a slack period of work. [18]

While the Company's evidence of a good business reason for discharge was strong, so was the General Counsel's evidence that there was no discharge at all, but rather a layoff which was inspired by anti-union motives. Indeed, as the Board now argues, this is one of those "rare occasions" where there was evidence of an employer's actual

16. We use the term "termination" deliberately in Freeman's case as a word which encompasses both the General Counsel's contention that Freeman was laid off and the Company's contention that he was discharged. Either action by the employer would constitute an unfair labor practice if carried out because of Freeman's union sympathies.

17. Cumberland argues that the testimony of Linda Catino should be entirely excluded because she was a former supervisor for the Company who was interviewed by the General Counsel without Company counsel present in violation of the NLRB's Case-Handling Manual, Part I, § 10056.5. The Company cites no precedent for the proposition that a violation of the Case-Handling Manual compels exclusion of later, freely given testimony of a witness, and we can think of no sound reason why such a violation should necessarily have this effect. Catino was not employed by the Company at the time this case was brought, and she initially evinced mixed feelings about renewing her ties to the Company even to the extent of testifying against it. When she realized that she was merely being asked to testify to what she knew, however, she readily agreed to cooperate. Any

violations of the Case-Handling Manual which may have taken place, therefore, (and we do not reach the question of whether there were any) certainly had no effect on the reliability of Catino's testimony. We thus find that the testimony was properly included. The Company also asserts that Catino's version of what Choquette said is subject to a perfectly innocent interpretation: namely that Choquette was repeating to Catino the charges contained in the labor complaint filed by Freeman. While this may be a possible reading, so is the more damaging interpretation given to the statement by the ALJ. Moreover, Catino herself characterized Choquette's words at one point as being that the Company fired Freeman "for trying to start a union." We are thus unwilling to disturb the ALJ's reasonable interpretation of Catino's statement and the inferences which he drew from it. NLRB v. Universal Packaging Corp., 361 F.2d 384, 388 (1st Cir. 1968).

18. Peck testified that Cumberland experienced a slack period in March and that he ordered layoffs for March 8. The Company offered no documentary or other proof, however, beyond Peck's assertion, to prove that any terminations were justified on this ground.

admission that he took action because of an employee's union activity. *NLRB v. Eastern Smelting & Refining Corp.*, 598 F.2d at 670. We think the Board was justified in believing and relying upon what the employer himself reported of his motivation and could conclude that in spite of his tardiness and the other circumstances, Freeman would not have been terminated but for his union activities. We therefore find substantial evidence to support the Board's conclusion that Freeman was illegally terminated.

We thus enforce the Board's order requiring reinstatement with back pay for employees Michael Freeman and Marcel Dulac, while we reverse the Board's order respecting employees Noel Roy, William Roy, and Robert Fluette.

*The Board's order in this case will accordingly be enforced in part and reversed in part.*